## In re EPIC MORTGAGE INSURANCE LITIGATION.

### M.D.L. No. 680.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 28, 1988.

---

James T. Williams, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., Paul C. Madden, Saul, Ewing, Remick & Saul, Thomas A. Allen, White & Williams, Philadelphia, Pa., Robert E. Payne, McGuire, Woods, Battle & Boothe, Richmond, Va., Irving P. Margulies, Weiner, McCaffrey, Brodsky & Kaplan, Washington, D.C., for plaintiffs.

William L. Stauffer, Jr., Frank, Bernstein, Conaway & Goldman, Tysons Corner, Va., Edward M. Posner, Drinker, Biddle & Reath, Philadelphia, Pa., Warren L. Dennis, Ballard, Spahr, Andrews & Ingersoll, Richard P. Schifter, Steven G. Reade, Michele J. Brace, Arnold & Porter, James L. Nolan, Jenner & Block, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This case involved two private mortgage guaranty insurance companies seeking to rescind mortgage insurance contracts covering loans originated by EPIC Mortgage, Inc. ("EMI") and sold by EMI to unaffiliated third parties in the form of whole loan pools and mortgage pass-through certificates.

The action brought by United Guaranty concerns the validity of certificates of mortgage insurance issued by United Guaranty to EMI. United Guaranty contends that its insurance was obtained by fraud and misrepresentation, and that it is entitled to rescind that coverage.

The action brought by Foremost seeks to rescind its insurance certificates, alleging fraud, misrepresentation, omissions and RICO violations on the part of EMI and Community. Defendant Dominion Federal contends that it is entitled to recover on the certificates of insurance, and for other damages, under principles of contract law, estoppel, and because the certificates became "unconditionally enforceable" once the loans were sold by EMI to Dominion; FNB contends that its certificateholders were entitled to recover on the certificates of insurance, and for other damages, based on principles of contract law, and because Foremost had violated sections 10(b) and 17(a) of the Securities Acts of 1933 and 1934, had aided and abetted any underlying fraud which may have been committed by EMI and had committed common law fraud, misrepresentation or constructive fraud; PSFS asserted that it was entitled to recover on the certificates of insurance, and for other damages, on essentially the same theories as those asserted by FNB, except that it did not assert liability for aiding and abetting securities fraud.

The EPIC product loans at issue in this litigation are loans which were either (a) acquired by the non-EPIC defendants herein prior to August of 1985 or (b) in the possession of EMI or CSL at the time the Maryland conservatorship was imposed.

All or virtually all of the EPIC product loans at issue in this litigation are in default.

These proceedings began as five separate cases, two of which were filed originally in this district and three others filed elsewhere. All cases were sent to this court by the panel on multi-district litigation for discovery and were consolidated for trial by order of this court on July 24, 1987. The court now makes the following findings of fact and conclusions of law, pursuant to Rule 52, Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff United Guaranty Residential Insurance Company (United Guaranty) is a stock mortgage insurance company, organized and existing under the laws of the State of Iowa with its principal place of business at 201 North Elm Street, Greensboro, North Carolina. United Guaranty is engaged in the business of writing private mortgage insurance, and is approved to do so by the Federal Home Loan Mortgage Corporation (FHLMC). United Guaranty maintains offices in several locations, including Annandale, Virginia.

2. Foremost Guaranty Corporation ("Foremost") is a stock mortgage insurance company, organized and existing under the laws of the State of Michigan with its principal place of business at 131 West Wilson Street, Suite 801, Madison, Wisconsin. Foremost maintains offices in several locations throughout the United States. Foremost is in the business of writing private mortgage insurance, and is approved to do so by the FHLMC.

3. Defendant Dominion Federal Savings and Loan Association, which purchased whole loans from EMI, is a federally chartered savings and loan association with its principal place of business at 7799 Leesburg Pike, Tysons Corner, Fairfax, Virginia.

4. Defendant First National Bank of Maryland, Trustee ("FNB"), is a national banking association with its principal place of business at 25 South Charles Street, Baltimore, Maryland. FNB serves as

trustee for certificate-holders pursuant to certain pooling and servicing agreements. In connection with this litigation it is trustee for:

(a) The Philadelphia Saving Fund Society ("PSFS"), now Meritor Savings Bank, a savings bank organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 1212 Market Street, Philadelphia, Pennsylvania;

(b) Silverado Banking ("Silverado"), a savings and loan association organized under the laws of the State of Colorado, with its principal place of business at 3900 E. Mexico Avenue, Denver, Colorado;

(c) Home Federal Savings & Loan of Xenia, Ohio ("Home Federal"), a federally chartered savings and loan association organized under the laws of the United States of America, with its principal place of business at 36 W. Detroit Street, Xenia, Ohio. In August, 1985, Unity Loan and Building Company (and/or its assets) was purchased by Home Federal; and

(d) Anchor Savings Association ("Anchor"), a savings and loan association organized under the laws of the State of Kansas, with its principal place of business at 8200 State Avenue, Kansas City, Kansas.

5. Silverado, Anchor, and Home Federal are not currently named defendants herein, but have agreed to be bound by whatever final judgment is reached as to FNB.

6. Defendant EPIC Mortgage, Inc. ("EMI") was a Delaware corporation with its principal place of business at 5111 Leesburg Pike, Suite 800, Falls Church, Virginia.

7. Defendant Community Savings and Loan ("Community") was a savings and loan association organized under the laws of the state of Maryland and insured by the Maryland Savings Share Insurance Corporation. Its principal place of business was in Bethesda, Maryland.

8. In September of 1985, Community was placed in conservatorship under the laws of the state of Maryland. The conservatorship was subsequently converted to a receivership. The Maryland Deposit Insurance Fund ("MDIF") is currently the receiver of Community.

9. All defendants herein, other than EMI or CSL (the "non-EPIC defendants"), purchased either mortgage pass-through certificates ("certificateholders") or whole loans ("whole loan holders").

10. EMI was a mortgage banking corporation which, among other things, originated the mortgage loans on the properties acquired by the EPIC partnerships ("EPIC product loans"). EMI was an indirect subsidiary of Community.

11. EMI ultimately sold the EPIC product loans to, among others, the non-EPIC defendants.

12. Equity Programs Investment Corporation (EPIC) was founded in 1974 based upon the concept that model homes could be purchased and leased back to builders. The EPIC Program, as of July 1981, was "national in concept and in practice."

13. EPIC was founded by Mr. Tom Billman in 1975. Mr. Billman held a substantial interest in EPIC and its affiliated organizations until approximately late February 1985, when the EPIC organization was restructured. Prior to February 1985, Billman owned 80% of EPIC Holdings, Ltd. (the ultimate parent of CSL and the EPIC group of companies); McCuistion owned 20%.

14. EPIC was in the business of organizing, syndicating, operating, and serving as general partner of certain real estate limited partnerships ("the EPIC partnerships").

15. In the earlier years of EPIC, the houses bought by EPIC limited partnerships were typically model homes, which would then be leased back to the seller/builder. Those leases would call for rent greater than that available from the public. Positive cash flow was generated, and those partnerships were therefore called "income partnerships."

16. In the latter years of EPIC's operation (including the time-period in which

Foremost dealt with EPIC), the EPIC limited partnerships primarily bought "production" rather than "model" houses. Those houses would be leased to the general public at rates inadequate to cover expenses; accordingly, the limited partner investors sought and received tax deductions as one benefit of their investments, and these partnerships were called "tax partnerships." Typically these were "two-to-one" deals, whereby (for example) a limited partner might invest $10,000 and be entitled to take a $20,000 deduction on his tax return.

17. In its first full year of operation, 1975, EPIC purchased sixty-eight model homes at a total capitalized cost of approximately $4,000,000. EPIC had developed a novel idea of promoting the purchase and syndication of model homes. It perceived that home builders would be interested in selling their model homes to EPIC and leasing them back at an agreed upon rent. EPIC entered these sale-leaseback transactions with the intent to syndicate the homes into real estate limited partnerships. The limited partners would realize tax benefits and the possibility of appreciation in the properties. The EPIC system was described as a six step process:

(1) evaluate builders' model homes;
(2) enter into sale-leaseback agreements with builders;
(3) arrange for financing of model home purchases;
(4) syndicate the limited partnership interests to the public;
(5) manage the properties during the partnership; and
(6) arrange for disposition of the properties upon dissolution of the partnerships.

18. The liability of limited partners for partnership debts was limited to the capital contributions and undistributed profits (i.e., appreciation of the homes). EPIC, as general partner, was liable for all debts above the limited partners' contributions and undistributed profits.

19. In 1976, EPIC purchased approximately $10,700,000 worth of builder model homes on behalf of thirteen limited partnerships and one general partnership.

EPIC also formed two wholly-owned subsidiaries, EPIC Realty Corporation, and EPIC Securities. EPIC Realty was to act as a commissioned broker/agent in real estate transactions among EPIC, EPIC partnerships, other entities and the general business public. EPIC Securities was to deal in securities.

20. In 1977, EPIC Mortgage, Inc. was formed to borrow and lend money. During 1977, EPIC purchased approximately $16,500,000 in builder homes and lots. During 1978 and 1979, EPIC created two additional wholly-owned subsidiaries, EPIC Financial, Inc. and ESI Securities, Inc. As of December 31, 1979, EPIC was a managing general partner in two partnerships and a managing general partner for eighty-one limited partnerships.

21. EPIC's growth (and apparent success) was explosive between 1977 and 1984. When Frank Bossle, EPIC's Senior Vice President of Marketing, began working at EMI, the Company had 15 employees. By the time of default, EMI had grown to approximately 200 employees. During the eight-year period between 1977 and 1984, the number of homes acquired by EPIC (and therefore the number of loan originations by EMI) increased dramatically each year:

| | | |
|---|---:|---:|
| Acquired in 1975 | 1 | $ 77,200.00 |
| Acquired in 1976 | 20 | 934,375.00 |
| Acquired in 1977 | 119 | 6,191,271.15 |
| Acquired in 1978 | 250 | 15,880,266.00 |
| Acquired in 1979 | 314 | 25,345,737.67 |
| Acquired in 1980 | 481 | 39,411,190.84 |
| Acquired in 1981 | 1058 | 104,874,219.00 |
| Acquired in 1982 | 2537 | 213,247,344.00 |
| Acquired in 1983 | 5010 | 370,171,093.24 |
| Acquired in 1984 | 6860 | 501,897,117.75 |

22. In 1981, EPIC projected acquisitions and dispositions for 1981 through 1985 as follows:

| | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Projected Property Acquisitions | $85 mil. | $120 mil. | $160 mil. | $200 mil. | $250 mil. |
| Projected Property Dispositions | $13.5 mil. | $36 mil. | $60 mil. | $120 mil. | $175 mil. |

23. EPIC projected loan originations by EMI of: $855 million in 1984; $1.015 billion

in 1985; $1.230 billion in 1986; $1.430 billion in 1987; and $1.510 billion in 1988.

24. EPIC had doubled its asset base for every year between 1978 and 1983.

25. Over the years, EPIC formed a variety of subsidiaries and affiliates, all devoted to handling some aspect of the EPIC Partnership Program. Chief among these were EPIC Realty Services, Inc. ("ERSI"), which served as property manager for the homes owned by the EPIC partnerships; EPIC partnerships to purchase their properties; ESI Securities, Inc. ("ESI"), which wholesaled the limited partnership interests in the EPIC partnerships; and EPIC Residential Network, Inc. ("ERNI"), which was charged with disposing of partnership properties. Another significant player in the EPIC story was Community Savings and Loan ("Community"), a Maryland-chartered savings and loan which EPIC acquired in March 1983.

26. Community, a stock savings and loan, was formed in 1958 as Republic National Building & Loan Association, Inc. (Republic National). In 1971, the association was moved to Montgomery County, Maryland and opened for business in 1973. With its move to Montgomery County, the association changed its name to "Community."

27. In October, 1982, Billman and McCuistion, through Equity Acquisitions, Inc., offered to purchase all of Community's stock for $3.50 a share. The Community Board reviewed and accepted the offer by Billman and McCuistion. By the end of October 1982, Equity Acquisitions had acquired eighty-five percent of Community's stock. On March 1, 1983, that percentage had increased to 99.4%. EPIC Acquisition, Inc. was a subsidiary of EPIC Holdings Limited ("EHL"). Billman and McCuistion owned EHL and through that company, owned all of the subsidiary companies.

28. On February 27, 1985, Equity Acquisitions, Inc. was merged out of existence into its immediate parent, EHL. Therefore, Community's immediate parent became EHL.

29. On February 28, 1983, Maryland banking officials gave preliminary approval to the acquisition subject to six conditions including submission of a letter from counsel concerning conflicts of interest under Maryland law between any subsidiary of EPIC and any officer of the company. Community was notified on March 8, 1983 that the acquisition would be approved.

30. By mid–1985, EPIC's affiliate, ERSI, was managing over 18,000 partnership homes with a total purchase price of approximately $1.4 billion. Over 357 EPIC limited partnerships had been formed by this point. EMI was recognized by the *American Banker* in 1984 as the seventh largest mortgage servicing gainer in the entire country.

31. EMI was the first lender in the country to issue a mortgage-backed pass-through certificate rated by Standard and Poors on non-owner occupied residential real estate. The security involves a pool of first mortgage loans on model homes purchased by EPIC as general partner in various limited partnerships. The mortgages on these homes serve as collateral for a certificate which was rated "A" and "AA" by Standard & Poor's and placed privately with a New England savings institution.

32. EPIC's reputation in early 1985 was that it had the strongest collection of talent in the business in the entire country and had an unblemished financial record.

33. Between 1983 and 1985 the officers of EMI were Kemp (executive vice-president and then president), Meltz (president), Bossle (senior vice-president), Swindell (vice-president, general counsel, and secretary), Deerin (vice-president), Jaffe (vice-president), and Mathias (treasurer).

34. Between 1983 and 1985, the officers of EPIC were Billman (president and chairman), McCuistion (executive and senior vice-president, and treasurer) Frazier (vice-president), Deerin (vice-president (and then president), general counsel, and secretary), and Meltz (executive vice-president and then president).

35. Several key EPIC employees were well known to United Guaranty and Foremost. Frank Bossle had worked for Loyola Federal, one of the largest lenders in the

Baltimore area. Lenny Meltz had previously worked for TMIC (known at the time as Ticor Mortgage Insurance Company) in California.

36. EMI was approved for its loan originations by a variety of government entities, including the FHA, VA and GNMA, and was also approved by Fannie Mae and Freedie Mac.

37. EPIC made a practice of hiring the best people in each field it entered and was approached by investment bankers seeking out EPIC's business.

38. Up until August 1985, EPIC had not had a default upon its entire portfolio of EPIC Product loans, a portfolio in excess of $1 billion. EPIC used the fact that it had never had a default on a mortgage loan as a selling point.

39. In August 1985, EPIC defaulted on a loan portfolio worth approximately $1.4 billion.

40. In late 1984—early 1985, the EPIC organization was restructured. The reorganization and recapitalization agreement is a lengthy and complex document with numerous exhibits.

41. Epicenter Consolidated, Ltd. ("Epicenter") was a holding Company which was the ultimate parent of EPIC, CSL, and EMI after the restructuring referred to above. Its principal place of business was 5111 Leesburg Pike, Falls Church, Virginia. As of May 24, 1985, the structure to the holding company which controlled Community consisted of two companies: Epicenter and EHL. Epicenter wholly owns EPIC Holdings and has no other subsidiaries.

42. EPIC and EMI were direct subsidiaries of a company called Community Financial Services, Inc. ("CFSI") which was a wholly-owned subsidiary of Community.

43. As of February 28, 1985, EPIC Holdings Limited owned 100% of the stock of Community Savings and Loan.

44. After the reorganization referred to above, Mr. McCuistion's interest increased. Mr. Billman's decreased. Stock was acquired by other officers and directors of EPIC and its affiliated organizations.

45. In the restructuring referred to above, stock in Epicenter was sold to executives of EPIC-related companies, including among others, Clayton McCuistion, Gene Isaacs, Mike Shomper, and Barbara Ann McKinney from March 1, 1985 through June 1, 1985.

46. By March 1985, it appeared unlikely that EPIC would meet its acquisition projections for the first six months of the year. Bob Kemp's calculations were that EPIC would need to acquire $175 million of properties in June 1985 in order to meet the six-month $300 million goal. The actual acquisitions in June 1985 were less than $33 million.

47. Between February 1985, and July 1985, EPIC purchased approximately $150,-000,000 worth of property.

48. The level of acquisitions by EPIC partnership properties in 1985 was as follows:

| Month | Number of Units | Purchase Price |
|---|---|---|
| January | 48 | 3,479,475. |
| February | 156 | 10,765,950. |
| March | 662 | 52,175,447. |
| April | 152 | 9,973,575. |
| May | 681 | 44,055,368. |
| June | 433 | 32,935,470. |
| July | 212 | 14,498,375. |
| August | 6 | 540,700. |

49. On May 10, 1985, during the Maryland savings and loan crisis, the Community Executive Committee directed Meltz and Frazier of EPIC to accelerate EPIC's normal process for acquiring properties, because the acquisition process generated significant cash to fund operations.

50. On May 14, 1985, directors of Community Savings & Loan resolved to seek a voluntary conservatorship from the MSSIC to limit to $2000 withdrawals of funds from accounts at Community.

51. On May 15, 1985, one day after Governor Hughes issued the proclamation restricting the withdrawal of funds from accounts at MSSIC-insured Maryland savings and loans, the Community Board of Directors rescinded its May 14, 1985 resolution seeking the imposition of a voluntary conservatorship.

52. Community paid dividends on its common stock of $6,762,000 in May and June 1984, of $8,000,000 in February 1985, and of shares of common stock of Crysopt Corporation in kind on February 27, 1985. The $6.8 million dollar payment was declared and ratified on July 23, 1985 pursuant to a Community written record of action stating that the original minutes authorizing the payments were lost. The $8 million payment was declared on February 6, 1985 pursuant to a Community written record of action.

53. Community paid eleven dividends of $977,617,000 on its Series A and Series C preferred stock for the period March 14, 1983 through March 31, 1985. The payments were ratified on May 1, 1985 pursuant to a Community written record of action.

54. During the crisis, the FHLBB examined Community for admission into the federal insurance system.

55. The Federal Home Loan Bank Board refused to insure Community unless it divested itself of EPIC. As a result of the denial of FSLIC coverage, EPIC's business "ground to a halt."

56. On August 13, 1985, Bob Kemp, of EMI informed Wilcox (of FNB) that the partnerships were going to default on their mortgage loans. Kemp represented to Wilcox that he did not know why the partnerships were not passing through the money needed in order to make mortgage payments.

57. On August 13, 1985, the same day that FNB approved a $10 million warehouse line of credit to EMI, FNB was informed of the EPIC default.

58. On September 5, 1985, immediately prior to Community (and thereby EPIC and the EPIC partnerships) being placed into conservatorship by the state of Maryland Deposit Insurance Fund, most of the EPIC partnerships were placed into bankruptcy.

59. Despite the proliferation of EPIC-related companies over the years, the same group of individuals remained in control of the entire EPIC enterprise. Throughout their tenure at EPIC, their varied positions involved them in all facets of the operation of the EPIC Program. These people included:

*Tom J. Billman.* Mr. Billman was the founder of EPIC. He served at various times as President of EPIC, President and Chief Executive Officer of Community Savings and Loan, Inc. and EPIC Holdings, Ltd., and sat on the Boards of Directors of EPIC, EPIC Mortgage, Inc., ERSI, ERNI, ESI Securities, EPIC Financial Services, Community Savings and Loan, and other EPIC-related companies. He served at various times as Chairman of the Boards of Directors of both Community and EPIC. Mr. Billman also sat on the Community Executive Committee and the Community Loan Committee.

*Clayton C. McCuistion.* Mr. McCuistion was President and Chief Financial Officer of Community Savings and Loan. He sat on the Boards of Directors of EPIC, EPIC Mortgage, ERSI, ERNI, ESI Securities, EPIC Financial Services and other EPIC-related companies. In addition, he was a member of a number of committees, including the Community Executive Committee and the Community Loan Community and the EPIC Asset/Liability Management Committee.

*Leonard Meltz, Jr.* Mr. Meltz was employed by Community Financial Services Corporation, the parent company of EPIC, until September 1985. Mr. Meltz was President of EMI from January 1980 until the spring of 1982, when he became President of EPIC. In the spring of 1983, he became Executive Vice President of Community Savings and Loan and President of Community Financial Services, Inc. Mr. Meltz was on the Boards of Directors of EPIC, EMI, ESI and ERNI. He served on Community's Executive, Finance and Loan Committees. The Presidents of EPIC and EMI reported directly to Mr. Meltz.

Each of these individuals invoked his Fifth Amendment privilege with respect to all substantive questions posed at his deposition. Other highly placed EPIC officials who relied upon their privilege against self-incrimination were Barbara A. McKinney and Joseph Cunningham. Ms. McKinney

was the Vice–President for Finance and General Counsel of EPIC Holdings, Ltd., which was one of the parent companies of EMI and EPIC. She also sat on Community's Executive Committee. Mr. Cunningham was the Treasurer of EPIC.

60. EPIC was in the business of forming limited partnerships in which it served as general partner. The partnerships would then acquire single-family homes with mortgage loans from EMI, typically 95% loan-to-value ratio. Individuals invested in these limited partnerships, primarily for tax benefits. The EPIC properties were to be held for rental until sold. Financial institutions purchased the loans originated by EMI.

61. The average property acquisitions consist of from 50 to 100 dwelling units for a purchase price from $4,000,000 to $8,000,000 for each syndication. These syndicated partnerships are composed of from one to 35 limited partners with each having an initial capital investment, with the balance being paid over a three year period in quarterly installments.

62. EPIC's standard operation rule of thumb was that roughly $4,000,000.00 worth of property would be put into one limited partnership. EPIC would open a number of limited partnerships and then assign property acquisitions to the various partnerships that were open.

63. ESI operates out of one office but distributes the EPIC real estate partnership investment opportunities through a nationwide network of financial planners and broker/dealers. The subsidiary receives 15% of the partnerships capital contributions as a commission for setting up the syndications with 8% to 10% being paid to the financial planners.

64. EPIC prepared documents called Private Placement Offering Memoranda ("Partnership PPOMs") in connection with its sale of limited partnership interests.

65. When a partnership was formed, it had a negative cash flow, also known as an operating deficit.

66. The structure of the EPIC limited partnerships called for contributions by limited partners to be made to the partnership over its lifetime. The contributions were typically calculated to be one-half the anticipated tax losses of the partnership in any given year, resulting in a "two-to-one deal".

67. EMI's policy was not to lend without a forward commitment to buy the mortgage.

68. EMI originated the mortgage loans so that EPIC on behalf of the limited partnerships could acquire the real estate properties. As of March 31, 1985, EMI was servicing loans on the "EPIC Product" totaling $1,241,708,255 secured by 17,689 non-owner occupied residential dwelling units.

69. As of March 31, 1985, there were 357 syndicated partnerships consisting of 6,090 limited partners owning 17,689 rental or non-owner occupied residential dwelling units located throughout the nation. Each of these dwelling units represents the security for the mortgages used by the partnerships to acquire these properties. The mortgages are originated and serviced by EPIC Mortgage, Inc. (EMI), another wholly owned subsidiary of CSL, that sells the financing instruments to permanent institutional investors, principally savings and loan associations throughout the nation. As of this date, there are 20,486 mortgages being serviced by EMI totaling $1,434,918,490 of which 17,689 (86.3%) totaling $1,241,708,255 (86.5%) represent the "EPIC Product".

70. Kimberly Trombley was responsible for the mechanics of closing EPIC loans and for the disposition of proceeds from such closings. With respect to closing EPIC product loans, Trombley received loan packages from the acquisitions department. After she determined which forward commitments the loans would close under, (i.e., to which lender the loans would be delivered), Trombley's staff would obtain title commitments, surveys, certificates of occupancy, termite certificates, notes and deeds of trust, and mortgage insurance would be obtained.

71. EPIC Realty Services, Inc. ("ERSI") was the company which was utilized to rent

the EPIC properties, collect rent and supervise repairs, among other things. ERSI was owned by Messrs. Billman, McCuistion, and Isaaca. For every house, $50 per month was paid to EPIC for property management, of which $35 per month was paid by EPIC to ERSI.

72. ERSI managed the rental units of the EPIC limited partnerships. It received $35 per unit per month from each of the 17,689 limited partnership rental units, plus one month's rent for each yearly lease and one half month's rent for each lease renewed.

73. Partnerships acquired all of their properties and began business before they were syndicated. It was the policy of EPIC that the limited partnership conducted business for the life of the partnership no matter how many limited partners there were.

74. There were three critical sources of funds available to cover the monthly mortgage payments of the partnerships: the rent, the rental deficit contribution (the "RDC") (or builder rebate) and the limited partner contributions. If these three streams dried up, advances from the general partner were available. It was the understanding of key EMI and EPIC personnel, however, that such advances were needed only in the later years of the partnerships, or were used only where a home had not been rented or had not been sold at the expected time.

75. Partnerships were generally structured so that the homes would be sold after the fourth year.

76. EPIC's final obligation as general partner was to dispose of the partnership properties.

77. Typically, after four years, partnerships would stop receiving capital contributions from the limited partners. Then, EPIC could sell homes, could resyndicate a partnership by grouping it with other partnerships in a new partnership, or could continue the partnerships, but EPIC would have to pick up the losses of the partnerships.

78. In theory, when an EPIC limited partnership reached the end of its expected 4-to-5 year lifetime, its houses were to be sold. The sale proceeds were to be used first to pay the expenses of sale; next to pay the mortgage loans; next to repay advances (if any) from EPIC; next to repay limited partner capital contributions; and finally, to pay profits, if any, to EPIC and the limited partners according to an agreed formula.

79. As the EPIC Program was structured, it was intended that the partnerships would own the houses for four to five years and that the homes would be sold at the conclusion of that period.

80. EMI represented that the rents and the rental deficit contribution and the partner contributions would be sufficient to carry the partnership mortgages for four to five years.

81. The rental deficit contribution was to be used for cash flow purposes to fund the differences between the rent received and the total mortgage payment for the house. In other words, in the production home context, it would have the same economic effect as a triple net lease (i.e. that it would cover all expenses). Thus, the RDC was meant to subsidize the partnership for the period of time in which it was holding the home.

82. The worksheet for the rental deficit contribution that EPIC provided to the mortgage insurers shows that the entire purpose of the rental deficit contribution was to make up the shortfall between the monthly mortgage payment and various expenses and investor contributions received. The worksheet calculates EPIC's cost to carry the property and nets that against the estimated rent and partner contributions. The RDC figure was supposed to be the present value of the difference calculated over a three-year period.

83. How the rental deficit contribution funds would be maintained was critical to United Guaranty and Foremost. EPIC represented to United Guaranty and Foremost that the rental deficit contribution would be held exclusively for the benefit of the particular partnership which had generated it.

84. Charles Kipp, Jim Ring, and Peter Ostrowski were on EMI's marketing staff in late 1984 and early 1985.

85. Ostrowski had a standard presentation that he made to potential investors, in which he advised that there were three streams of income available to satisfy EPIC product loan mortgage obligations: capital contributions by limited partners; rents; and a rental deficit contribution.

86. Ostrowski represented that the RDC became part of the partnership's assets, as opposed to EPIC accounts, and that it was used to cover the difference between the rent and the mortgage payment.

87. Ostrowski understood that the RDC was sufficient to carry the cost of the mortgage for a minimum of 36 months.

88. Jaffe and Kipp had the same understanding of the program as Ostrowski did. The presentations of other marketing representatives of EMI was significantly the same as Ostrowski's. All of the marketing representatives got their information on and understanding of the program from Frank Bossle.

89. While Kipp was at EMI, he was frequently asked where the RDC went and he answered that the money was earmarked for the specific piece of property. He told all people the same story. His answers did not vary. He did not distinguish between the money being held in a specific account and the money being commingled but accounted for separately.

90. When Kipp made a sales presentation to a potential institutional purchaser of EPIC product loans, he gave them promotional information on EPIC, financial statements, annual reports, sample commitment letters, sample pass-through documents, sample partnership agreements, and letters from private mortgage insurers stating how much in EPIC product loans they had insured without a single claim.

91. Kipp also told lending institutions that the rentals on the houses were a source of income for payment of the mortgage.

92. Kipp sold approximately $960,000,-000 in product loans in the six and a half years that he was at EPIC.

93. EPIC made identical representations about the rental deficit contribution, in writing, to the Federal National Mortgage Association.

94. A similar representation was made by EPIC in response to an inquiry from a savings and loan association. A highly placed EPIC officer stated that

> [t]he explanation of the rental deficit contribution is that *it's left in the Partnership* to help cover debit service over the anticipated life of the loan. I believe this is explained in Section XII of the Partnership Memorandum under Compensation and Fees to the General Partner.

95. The same statement was made by EPIC to the Federal Home Loan Bank Board. EPIC told the FHLBB in the context of Community's application for FSLIC insurance that the RDC was designed to carry the mortgage for a four-year period. The May 24, 1985 examination of Community explicitly states that the RDC is designed to meet the "costs of carrying the property by the limited partnership over the four-year anticipated holding period".

96. That the rental deficit contribution was held for the benefit of the partnership generating it was also the understanding of the EMI officials who were responsible for explaining the EPIC Program to lenders, insurers and others. Mr. Kemp, the President of EMI, assumed that the rental deficit contribution, being an asset of the partnerships, went to the individual partnership.

97. Mr. Bossle, EMI's Senior Vice–President of Marketing, thought right up until August 1985 that there was money in the rental deficit contribution cash flow to carry the partnership.

98. EPIC purchased its properties pursuant to a form contract known as a Residential Rental Purchase Agreement. This document was provided to United Guaranty to identify each home securing a loan which it insured. Every Residential Rental Purchase Agreement stated that:

On the closing date, seller shall pay to the purchaser a sum equal to the percentage as set forth on Exhibit "A" hereof of the purchase price of each property as a contribution towards rental deficits (herein referred to as the "Rental Deficit Contribution").

Exhibit "A" listed each home individually and the RDC amount received on each purchase.

99. EPIC represented to United Guaranty and Foremost that the RDC would be held in escrow.

100. The same thing was told to Empire of America. That institution received a summary of terms for a $20 million purchase of EPIC loans. The summary stated, with respect to "Debt Service Coverage Sources" the following:

1) Rental and/or lease income

2) Limited partnership contributions

3) Rental Deficit Contribution (Average 25% of sales price of house *and is held in escrow by EPIC.*

4) Interest advance by EPIC (if necessary)

101. MGIC was also told (by Tom Billman) that the RDC was placed in escrow.

102. This was also the understanding of FNB. Mr. Wilcox of FNB stated at his deposition that he understood that certain sums of money were placed *in an escrow account* by the builder for funding over a minimum of a year period.

103. Dominion Federal understood that the funds of the partnerships would be held in escrow.

104. After the default, Dominion even wrote EPIC asking where the RDC funds were being held. A Dominion officer, writing EMI about an EPIC project known as Cedar Ridge in Hurst, Texas, stated that the rental deficit funds were to be "dedicated to the sole purpose of supplementing the tenant rental payments on a month-to-month basis for purposes of making the monthly mortgage payments on the note for Cedar Ridge." Dominion inquired as to where the funds were maintained and the current balance in the account.

105. Others shared this understanding. For example, First Federal Savings and Loan Association of Kokomo inquired whether "there are any funds left *in escrow* subsidizing rent deficiencies?" The residential rental purchase agreement for the Cedar Ridge project is virtually identical to the later residential rental purchase agreements received by United Guaranty.

106. Winner of PSFS, understood that the partnerships received, from the seller of property, rental deficit contributions to be used while the partnerships owned the properties, to support debt flow obligations.

107. Winner also understood that limited partnership contributions, rental income and the RDC would be enough to pay debt service on the loans for the term of the partnership.

108. Winner was satisfied by EMI's representations that the RDC's had been paid for use by the partnerships for as long as they owned the properties; he made no independent search for rental deficit contributions to the limited partnerships. Winner was satisfied that there would be adequate funds available to the borrower to pay the debt service on the mortgages.

109. A similar inquiry was made by Shadow Lawn savings and Loan Association. In a letter to Frank Bossle, Shadow Lawn said that "[t]he private placement offering statement stated that the builders had provided $992,398.12 as rental deficit contributions. Have any of these funds been used to make the mortgage payments and what balance of these funds is currently in the hands of the partnership mortgagor/mortgagors?"

110. The handwritten notes of the individual at Silverado Banking responsible for the EPIC purchasers also indicate a belief that these funds would be held separately.

111. EMI and Community represented to their other loan purchasers and prospective purchasers that the RDC was to be segregated for payment of the mortgage debt.

112. Kipp told purchasers that the RDC was a source of income to support the

properties within a partnership and that it was left in the partnership to help cover debt service. Kipp explained this to an officer of Colony First Federal Savings and Loan and confirmed it in a letter dated November 12, 1984.

113. Empire of America made five purchases of EPIC product loans from EMI of $55 million total. Empire received a proposal from EPIC through Bear–Stearn's dated May 14, 1985, relating to one of its transactions. The proposal states that the debt service will be covered by a rental deficit contribution *held in escrow*, lease income, limited partnership contributions, and a interest advance by EPIC (if necessary).

114. Shadow Lawn Savings and Loan is a New Jersey savings and loan association which is the owner of EPIC Mortgage Pass–Through Certificate Number 1, Series 85–II, dated February 19, 1985. Shadow Lawn owned a 100% interest in the pool which was backed by fifty-three (53) mortgage loans. On August 26, 1985, subsequent to the EPIC defaults, Christopher Widdis, Vice President of Shadow Lawn Savings and Loan wrote to Frank Bossle of EPIC Mortgage, Inc. inquiring as to the whereabouts of funds to make mortgage payments and stated as follows:

The Private Placement Offering Statement stated that the builders had provided $992,398.12 as rental deficit contributions. Have any of these funds been used to make the mortgage payments and what balance of these funds is currently in the hands of the partnership mortgagee/mortgagors?

115. A copy of this letter was also sent to FNB, as trustee. It was Shadow Lawn's understanding, based on the representations made to them and in the private placement offering statement that builder rental deficit contributions would be available to make the mortgage payments by Shadow Lawn.

116. EPIC Partnership PPOM's also represented that the RDC would be available. For example, Schedule D for limited partnership 84–76 shows that this partnership should have enough money to pay its bills (without general partner advances) for a period of time, greater than 15 months. See also, descriptions made in the limited partner PPOM's, the pool PPOM's (Builder rebates are referred to as "cash" in the section of the private placement offering memorandum headed "Maximum Leverage.")

117. EMI and Community represented to other mortgage insurers that the RDC was to be segregated for payment of the mortgage debt. For example, Tom Billman explained to Lacy, of MGIC, that the RDC was a contribution into escrow that came out of the acquisition of property. The RDC was used to pay the deficiency between income and the payments on the mortgage debt. The RDC either came out of the proceeds of the sale or was paid by the builder.

118. Representatives of EPIC and Community met with Pollack of MGIC and discussed "the kinds of reserves that were established and funds that were segregated out of the closing proceeds to fund negative cash flows...."

119. The following description appears in the EPIC informational brochure: *The Appeal of EPIC's Mortgage Pass–Through Certificates:*

An additional source of cash flow for the Limited Partnership involves the collection of a rental deficit contribution (RDC) from the proceeds of each property. This cash contribution is realized in the purchase of non-model homes or Builder production units. It generally totals 16 percent to 20 percent of the purchase price of each property. *The RDC is utilized to help maintain ongoing cash flow requirements for the life of the Partnership.*

120. The representations about how the RDCs were treated were false. Rental deficit contribution funds were not held for the benefit of any particular partnership.

121. The second critical component of the partnership cash flow was the money paid in by investors purchasing EPIC limited partnership units. It was represented that these funds would also be held for the

**1208**

benefit of the partnership to which they were attributable. These funds were approximately 20% of the purchase price of the home. These funds were not held separately. They were commingled with EPIC's general funds.

122. EPIC represented that the rents it received were generally 7 to 9 percent of the purchase price of the unit.

123. Rentals of the EPIC properties were handled by an EPIC affiliate, EPIC Reality Services, Inc. ("ERSI"). ERSI was owned by Tom Billman, Clayton McCuistion and Eugene Isaacs. ERSI received a fee of $35.00 a house per month from EPIC for managing the properties.

124. EPIC represented that the rents, like the RDC and the limited partners' contributions, would be held for the benefit of the partnership entitled to receive them.

125. United Guaranty and Foremost agreed to insure the EPIC Program based on their understanding that the partner contributions and rents and rental deficit contributions for each partnership would be held for the benefit of such partnership —separately. The specific representations made to United Guaranty and Foremost on this subject are discussed below.

126. United Guaranty's first contact with EPIC Product loans was in late 1983 or early 1984, when it agreed to reinsure some EPIC Product loans.

127. Under this reinsurance exposure, United Guaranty's liability would have arisen only to the extent that the lender's losses were greater than 25 percent of the loan amount. This first 25 percent of the risk would be borne by the primary insurer. And even if the loss penetrated beyond that initial 25 percent, United Guaranty's exposure would have been limited to one-third of the excess loss.

128. On August 27, 1984, United Guaranty issued a master policy to EMI for its single-family residential business. This master policy was not issued for the purpose of accepting the EPIC partnership loans for insurance. In fact, United Guaranty rejected a package of partnership loans submitted by EPIC because they had not been approved.

129. The issuance of a master policy does not constitute a commitment of insurance until subsequent actions are taken when specific loans are submitted for approval.

130. The decision to insure EPIC partnership loans is one that United Guaranty weighed for several months over a series of meetings with EPIC Mortgage. United Guaranty did not insure its first EPIC product loan until approximately five months after the issuance of the master policy.

131. United Guaranty gave more time and attention to its decision to insure the EPIC loans than to its decisions to insure routine, owner-occupied loans.

132. In making its decision to insure loans originated by a lender with which the insurer has had no prior experience, the insurer looks to the reputation of the lender. It attempts to determine its track record in the industry and how its current delinquencies are running. EPIC's record was flawless. Another indicator of quality is a lender's approval by the Federal Home Loan Mortgage corporation or the Federal National Mortgage Association. EPIC was approved by both. In addition to EPIC's explanation of its program, these were facctors that United Guaranty considered in deciding whether to take the EPIC risk. This evaluation of the character and ability of a lender is the most important element of mortgage underwriting. Mortgage insurers also look to the identity of the institutions purchasing the loans originated by the lender. EPIC sold to some of the biggest and most respected lenders in the business.

133. The Federal Home Loan Mortgage Corporation's eligibility requirements for private mortgage insurance companies recognize that the key element of mortgage insurance underwriting is the review of the lender as opposed to the review of the individual loans.

134. United Guaranty's agreement to insure the EPIC partnership loans was a "negotiated transaction". In the context

of a negotiated transaction, the insurer and the lender agree in advance regarding the insurance of a set of loans that will have agreed upon terms and features. These types of loans may not be subject to the same type of review as the standard "spot loans" (i.e. owner occupied loans) which mortgage insurers also insure. Generally announced policies or guidelines do not apply to negotiated transactions, which rest upon negotiated parameters. The Federal Home Loan Mortgage Corporation's eligibility requirements for private mortgage insurance companies do not apply to negotiated transactions. Mortgage insurers examine insured loans only in a "review" capacity. They check to confirm that certain required documents have been prepared, but never attempt to determine the accuracy of data submitted to them.

135. United Guaranty conformed with industry standards in its agreement to insure EPIC partnership loans.

136. The first substantive meeting between United Guaranty and EPIC took place in April 1984. Guy Luno, United Guaranty's Vice–President of Risk Management, met with EPIC representatives in Falls Church, Virginia along with Kerry Rainey, a United Guaranty Regional Vice–President. Frank Bossle discussed with them what EPIC was doing as a company.

137. United Guaranty personnel attended two later "due diligence" meetings with EPIC. These meetings held by EPIC were an opportunity to allow potential participants in the EPIC Program—such as mortgage insurers, investment bankers and savings and loans—to see the inner goings-on of the EPIC organization as well as to meet the principal officers of the various EPIC companies. Generally the President or the second or third person from a particular company would speak.

138. Mr. Gillison attended a due diligence meeting at the EPIC offices in November 1984. He met with Frank Bossle, who explained EPIC and how the various EPIC entities worked. Officers of various EPIC companies came in and talked about their particular functions. Mr. Gillison met with Bob Kemp (of EMI), Gene Isaacs (of ERSI) and John Frame (of ESI).

139. Mr. Gillison was told that the funds available to pay the mortgage loans would be the rental deficit contribution, rentals and limited partner cash contributions. Mr. Bossle said that the funds available to the partnership would be sufficient to carry the mortgages for the first five years. Mr. Gillison was further told that EPIC was doing fine in selling partnership interests to investors.

140. The entire thrust of Mr. Bossle's presentation to Mr. Gillison was that the "whole EPIC wheel was turning and just working great. That everything was working like it was supposed to".

141. Mr. Gillison was impressed with what he had seen during the November meeting. Based upon the presentations by EPIC personnel, the EPIC business appeared to be good solid business.

142. If United Guaranty had known that the EPIC companies depended on acquisitions of new properties and formations of new partnerships to generate funds to pay the obligations of older partnerships, as it subsequently discovered, it would not have insured the EPIC loans.

143. Following the November 1984 meeting, Mr. Gillison also looked at the December 31, 1983 financials for Community Savings and Loan. He saw no red flags and nothing out of order in that document. He also observed nothing in the 1983 Community financials to indicate that the advances to the partnerships were not collectible.

144. Mr. Gillison also reviewed a document entitled "The Appeal of EPIC's Mortgage–Backed Pass–Through Certificates" and that confirmed Mr. Bossle's discussion of the rental deficit contribution.

145. Following the November 1984 meeting, Mr. Gillison sent United Guaranty's Vice–President of Risk Management, Guy Luno, back to meet with EPIC again.

146. Mr. Luno and Kerry Rainey of United Guaranty met with Frank Bossle and other officers of EPIC. Various department heads, including Mr. Isaacs and

Mr. Meltz, explained what their function was and what their departments were doing. Frank Bossle told Mr. Luno at the January meeting that the rental deficit contribution was placed into escrow, and that it would be used to fund deficiencies during the partnership period of three to five years.

147. EPIC represented that each one of the partnership deals was separate and apart from any other deal and that the individual partnerships were self-supporting and could stand on their own. Mr. Luno was told that the rent along with the other payments put into escrow were sufficient to carry the mortgage debt.

148. There were no statements made at the January meeting that EPIC had the ability or authority to borrow from the partnerships.

149. United Guaranty would not have insured the EPIC loans if it had known that the new partnership acquisitions were generated, and the funds of such partnerships were being appropriated, to pay the debts of old partnerships (as it subsequently discovered).

150. Based upon the representations at the January meeting, Mr. Luno formed a conclusion that there was adequate protection during the initial term of the partnership. He told Mr. Gillison that he had concluded that there was safety in the deal.

151. Prior to making the decision to insure EPIC, Mr. Gillison talked to the officials of other mortgage insurers about EPIC. It was common at this time for mortgage insurance companies to trade information in this manner. The President of MGIC told Mr. Gillison that their experience with EPIC had been very good and that they would be doing more business with EPIC before too long. MGIC is the private mortgage insurance industry's acknowledged market leader. Bill Simpson, the President of RMIC, another mortgage insurer doing business with EPIC, said that he was still actively doing business with them and that they were fine and that he had had no problems or losses with them. Bob Cohen, Mr. Gillison's contact at TMIC, said that he knew nothing derogatory about EPIC. At the time, Mr. Cohen was the chief financial officer of TMIC.

152. A few months later, Mark Pollack of MGIC told Mr. Gray (United Guaranty's General Counsel) that the reasons MGIC was not doing business with EPIC was that they had taken enough risk for EPIC and that they wanted to let some time pass. Mr. Pollack said, however, that their experience had been "excellent." MGIC had received no claims from EPIC at that point.

153. The representations by MGIC were not true. They resulted from a deliberate agreement between EPIC and MGIC to mislead other members of the mortgage insurance industry.

154. In February 1983 MGIC had recognized that until EPIC could sell partnership properties, it could generate sufficient revenues only by making more acquisitions. Memorandum from Gordy Steinbach to Mark Pollack, dated February 1, 1983.

155. MGIC had had an internal discussion about discontinuing its insurance of EPIC Product following a meeting with EPIC on June 27, 1983. At this meeting, Bill Lacy, the President of MGIC, stated, "[w]e have to get away from this account—how do we do it?" *Memorandum from Gordy Steinbach to Mark Pollack*, dated August 9, 1985.

156. Following this display of concern, officials of MGIC had met with Lenny Meltz, Bob Kemp and Dick Deerin at EPIC's offices. MGIC indicated at this meeting (which took place on August 11, 1983) their desire to discontinue insuring the EPIC Product, in part because of their concern about the lack of sales by EPIC from previous partnerships. The EPIC people accepted the decision, but were concerned that if other mortgage insurers heard of MGIC's decision, that it could have adverse consequences for EPIC. MGIC "agreed that if anyone inquires as to whether MGIC is still doing product/inventory business for EPIC we will say that we are." *Memo from Mark Pollack to File*, dated August 25, 1983.

157. The true reason why MGIC had discontinued insuring EPIC was never dis-

closed. At a meeting with United Guaranty in Greensboro in May 1985, Larry Pratt of EPIC told United Guaranty that MGIC had quit insuring EPIC because of concentration of risk problems.

158. The concerns of MGIC and EPIC's other major mortgage insurers had reached such a high degree that in a meeting on May 22, 1985, they had requested that an "[o]verall Workout Program ... be in place within ninety days." *Memorandum from Lenny Meltz to Billman, McCuistion and Deerin*, dated May 23, 1985. In Meltz's view, these companies were serious about "getting out". *Id.*

159. At this meeting Mr. Meltz told Gary Bradford, the President of TMIC, that if EPIC could not continue to get mortgage insurance that *"the whole house of cards would come down"* Mr. Meltz also revealed that EPIC had a severe cash flow problem. None of this was disclosed to United Guaranty, *even though EPIC officers met with United Guaranty the very next day.*

160. As a result of its meeting with its primary mortgage insurers, Community agreed to immediately reduce its projected acquisition volume for the calendar year 1985 to $500,000,000. It further agreed to analyze its cash flows to determine whether a further reduction in this amount could be made. *Letter from Lenny Meltz to John Hooff,* dated May 31, 1985.

161. Mr. Gillison decided to insure the EPIC loans on a limited basis in January 1985, after Mr. Luno's meeting at EPIC's offices. He instructed that all the business should come through a single office so that it could be monitored on a regular basis. Mr. Gillison received weekly reports on the EPIC account.

162. It is common in the mortgage insurance business for an insurer to take loans for insurance on a trial basis, with the idea of developing an experience with the lender.

163. United Guaranty officers met with Frank Bossle and Larry Pratt of EPIC on May 23, 1985 in United Guaranty's offices in Greensboro. *The presentation at the May 23 meeting was essentially the same as what Mr. Gillison had heard in November of 1984.* In other words, all the representations made in May had also been made prior to the time United Guaranty began insuring EPIC. In attendance for United Guaranty in May 1985 were William L. Hemphill, the President and Chief Executive Officer of United Guaranty's parent company; William H. Gillison, the President of United Guaranty; Guy Luno, United Guaranty's Vice-President of Risk Management; Robert Rosenblum, United Guaranty's Vice-President of Operations; Richard L. Gray, United Guaranty's General Counsel; and Chris Avren, United Guaranty's National Sales Manager.

164. Mr. Bossle described the history of EPIC and how well they had done. He emphasized that EPIC was selling loans to FMMA and had already sold about $120 million of loans to FNMA. He mentioned EPIC's relationship with Salomon Brothers and pointed to a "blue ribbon" group of lenders to which EPIC had sold loans over the years.

165. Mr. Bossle stated that EPIC had never had a mortgage insurance claim in its history.

166. Mr. Bossle explained that since the rent from the houses was insufficient to cover the mortgage debt, that EPIC obtained a rental deficit contribution from the builders. Bossle indicated that this RDC averaged 18.1 percent or 18.2 percent of the purchase price of the home. Mr. Bossle explained that the typical partnership would hold 40 to 50 houses worth $4 million to $5 million. With respect to the limited partner contributions, Mr. Bossle stated that these would be approximately 20 percent of the purchase price of the homes.

167. Mr. Bossle said that each partnership "stood on its own." It was significant to United Guaranty that these partnerships were separate entities because the funds in the individual partnerships were needed to pay the mortgage loans held in those partnerships. Mr. Bossle said that these funds would be held separately within each partnership for this purpose. He *affirmatively stated that there was no commingling*

*of funds.* This was critical to United Guaranty because the rental deficit contributions which had been individually computed for each property had to be there when if was needed. Mr. Bossle used the words "in escrow" and "in trust" in describing the funds of the partnerships.

168. Mr. Bossle indicated on a blackboard in the United Guaranty conference room that the funds would be held in escrow to pay the mortgage debt for the first five years. Mr. Hemphill made calculations to satisfy himself that the funds were there to carry the partnership into its fifth year of existence. Without this understanding, United Guaranty would not have insured the EPIC loans.

169. Mr. Bossle indicated no difficulties in disposing of the properties. He said nothing about any difficulty in selling properties coming out of older partnerships. With respect to the sales of homes, Mr. Bossle stated that the partnerships were just starting to roll out of the old partnerships. There was no statement made by Mr. Bossle to indicate that EPIC was experiencing problems in selling partnership properties in late 1984. Had United Guaranty known that EPIC was having difficulty selling partnership properties, it would have changed the nature of the risk.

170. Mr. Bossle indicated no difficulty selling limited partnership interests. He said they had been successful for a long period of time and were doing well. If United Guaranty had been told that EPIC was having difficulty selling partnership units, this would have changed the nature of the insurance risk.

171. Mr. Bossle stated that the financial condition of the EPIC group of companies was sound and that their partnerships were doing well. As demonstrated elsewhere, however, the entire EPIC enterprise was experiencing severe financial problems for weeks before this meeting.

172. Mr. Hemphill learned nothing in the May 23 meeting that caused him any concern.

173. Mr. Gray's recollection of the May 23 meeting is similar to that of Mr. Gillison and Mr. Hemphill. Mr. Bossle identified the three major sources or cash flow available to the partnerships—the RDC, the rent and the limited partner contributions. Mr. Bossle advised that the cash flow funds would be placed into an escrow account and Mr. Gray reflected this in his notes.

174. At Mr. Gray's request, Mr. Luno wrote Frank Bossle at EPIC Mortgage on April 19, 1985 and requested a copy of EPIC Mortgage's "standard private placement memorandum, registration statement or other offering documents ..."

175. Approximately a week after the May 23, 1985 meeting, Mr. Gray received a copy of EPIC's private placement offering memorandum. This was the PPOM for EPIC Associates 85–IV, a limited partnership offering. He finished his review of that document not later than May 31, 1985. Mr. Gray assumed that he had indeed received EPIC's "standard" private placement offering memorandum. Mr. Gray did not review the financial aspects of the offering, but did review the offering aspect. The things Mr. Gray had been told at the May 23 meeting were confirmed in the private placement offering memorandum.

176. Although Mr. Luno had requested a copy of EPIC Mortgage's "standard" PPOM, a copy of the partnership PPOM was delivered. United Guaranty was never told and never knew that EPIC Mortgage prepared "pool PPOM's" despite Mr. Luno's request.

177. In mid-May 1985, Mr. Hemphill spoke with Bill Simpson, the President of RMIC, another mortgage insurer. Mr. Hemphill had heard that RMIC was one of three companies that had commissioned an audit of the EPIC companies by Touche Ross. Mr. Simpson said that the results of the study did not indicate any cause for alarm.

178. Mr. Hemphill inquired about the Touche Ross study at the May 23 meeting and Mr. Bossle responded that EPIC had come out with a clean bill of health.

179. Mr. Gillison spoke with Bill Lacy of MGIC about the Touche Ross audit. Mr. Lacy said that the audit raised no

problems and that everything with EPIC was fine. Dick Gray also spoke with representatives of MGIC and TMIC regarding the Touche Ross audit. Representatives of TMIC and MGIC said that it was their understanding that the report gave EPIC a clean bill of health.

180. Mr. Luno checked again with TMIC regarding their experience with EPIC in May 1985. He was told that the Touche Ross audit of EPIC had been completed and that "EPIC passed the test". *Memorandum from Luno to Gillison,* dated May 13, 1985. Following the receipt of this information, Mr. Luno spoke again with Mr. Bossle and was told that EPIC did not have any delinquent insured loans.

181. The *Touche Ross Report* was a comprehensive study on EPIC. The accountants reviewed significant documentary materials relating to EPIC, including its financial statements and its offering memoranda, and conducted interviews with at least ten highly placed officers of EPIC and EPIC's outside accountant.

182. The *Touche Ross Report* contains a thorough description of the EPIC Program. The report is most noteworthy, however, *for what it does not contain.* Completed just a few short months before EPIC's default and after a major review of EPIC by another major accounting firm, the report gives not even the slightest inkling of the grave financial problems which caused EPIC's default. There is not a single mention in all of the report of the extensive borrowings from the partnerships. Nor is there any mention of EPIC's daily commingling of the funds of its partnerships or the financial stress caused by EPIC's decision to hold the homes still owned by its early partnerships.

183. Following the May 23 meeting, Mr. Hemphill discussed with Mr. Gillison the risk that the properties would not be sold at the end of the fifth year. This was the risk they perceived in the EPIC Program as it had been explained. Mr. Gillison suggested the idea that United Guaranty should write coverage for EPIC that was shorter than the five-year period. This would be unusual, because typically mortgage insurance remains effective until the mortgage is paid off and renewal is at the option of the lender.

184. Mr. Gillison asked Dick Gray, the Company's General Counsel, to prepare an endorsement that would take United Guaranty out of the risk before the end of the five-year period.

185. The purpose of the amendatory endorsement was to deal with what United Guaranty perceived as the real risk of EPIC—that there be sufficient cash flow to take the partnership to its expected sales point. The amendatory endorsement was a way of avoiding a down housing market at the time the homes were to be sold. The reason for the amendatory endorsement was not to cut EPIC off.

186. In July 1985, United Guaranty wrote EPIC that it had reevaluated its insurance of the EPIC Product and was considering an amendatory endorsement which would limit the time period of its risk. *Letter from Guy Luno to Frank Bossle,* dated July 26, 1985. This letter was written by Guy Luno at Mr. Gillison's request. If EPIC had agreed to the amendatory endorsement, United Guaranty would have continued to insure EPIC loans.

187. United Guaranty met one final time with EPIC—on August 1, 1985. United Guaranty's purpose at that meeting was to discuss the amendatory endorsement. The tone of that meeting was positive. Mr. Kemp of EMI stated that everything was fine and going well.

188. Shortly after the August 1 meeting, Mr. Kemp called Mr. Gillison and said that EPIC was going to be in default on their loans but that it was a temporary situation that would be resolved in a couple of days. This did not happen. EPIC defaulted on its entire billion dollar loan portfolio.

189. If the sources of funds had been as EPIC had explained them to United Guaranty, it would have been impossible for the loans insured by United Guaranty to have defaulted so quickly. The first mortgage payment was never made on any of these loans. Even Mr. Bossle and Mr. Kemp, the

key officers at EMI, thought that the new partnerships had enough funds to carry them for years, and that a default after just a few months would be impossible.

190. The majority of the payments due on the United Guaranty loans were not due to be made until August and September of 1985. If the EPIC Program had operated as it had been represented, it would have been impossible for these loans to have gone into default so quickly.

191. United Guaranty gave notice of rescission to EPIC Mortgage on August 15, 1985. Following the mailing of that letter, United Guaranty promptly refunded all premiums it had received from EMI to EMI. Premiums received from EMI following the rescission were promptly returned to EMI. This lawsuit followed.

192. Foremost is a fully licensed mortgage insurance company. It is a "AAA"-rated insurer by Standard & Poor's and Fitch's Investor Services and is rated "A–1" by Moody's.

193. Over the last three years, Foremost has insured between 21,000 and 23,-000 primary insurance policies annually. Also, in 1987, Foremost underwrote approximately 15,000 pool policies and approximately 8,000 second lien or revolving line policies.

194. Foremost was the last insurer involved with EPIC and the insurer insuring the smallest amount of EPIC product loans. As of April 30, 1985, Foremost had insured a small fraction of EMI's total loan originations on EPIC Product. An internal EPIC document showing insurance in force as of April 30, 1985 indicates how Foremost stood in comparison to the three largest insurers of EPIC Product loans—EPIC, MGIC, TMIC and RMIC:

| | |
|---|---|
| [TMIC] | $617,209,872 |
| RMIC | 335,774,921 |
| MGIC | 217,078,693 |
| Foremost | 101,650 |

195. At a savings institution convention in September 1984, Richard Strasser of Foremost bumped into Charles Kipp of EPIC Mortgage Inc., who was manning a promotional booth.

196. At the convention, Kipp explained the "EPIC story" to Strasser in the same way that he told it to lenders. A day or two later, Strasser met with Bossle and others in Falls Church, Virginia. Foremost had not insured any EPIC loans before these meetings.

197. Strasser and John Schienle, Executive Vice President of Foremost, met with Frank Bossle at the EPIC offices on September 4, 1984, and heard a presentation on the EPIC program.

198. At the meeting on September 4, 1984, it was represented by EPIC Mortgage, Inc. that additional mortgage insurers were needed because EPIC's principal existing insurer was at or near capacity.

199. At the meeting at the EPIC offices on September 4, 1984, it was represented to Foremost, among other things, that a rental deficit contribution ("RDC") of approximately 20% was to be paid by a seller of property to the partnership purchasing the property to be used solely to pay any deficit in the partnership's ability to pay its mortgage obligations. It was also represented that if expected rental and limited partner contributions were received, the RDC would insure the payment of partnership expenses for at least 36 months. Mr. Schienle of Foremost understood that such RDC was to be placed in to a separate account of the partnership.

200. Mr. Douglas Whiteley was Vice President of Underwriting of Foremost at various times in the period of 1984 and 1985. Mr. Whiteley was the principal risk assessment officer of Foremost. His only limitations on approving any loan for insurance are state insurance regulations. It was Douglas Whiteley's job to analyze the EPIC program and to make the insurance decision.

201. At the request of Mr. Schienle, Mr. Douglas Whiteley met with representatives of EPIC Mortgage, Inc. and other EPIC affiliated companies on October 5, 1984 to hear a presentation of the EPIC program. Mr. Whiteley received and reviewed a copy of the 1983 Community/EPIC consolidated financial statements, which had earlier been given to Schienle. Whiteley reviewed

the financials to be sure that EPIC and Community had a net worth, were profitable and were growing.

202. At the October 5, 1984 meeting, representatives of EMI and EPIC explained the EPIC program. He understood the RDC to be discount from the purchase price of property. Ostrowski gave Whiteley a presentation on how the RDC was derived and its uses.

203. Representatives of EPIC Mortgage, Inc. represented to Whiteley that the EPIC companies were in good financial condition and that their program was very successful, and that it had an excellent track record, net worth, and growth.

204. EPIC represented to Foremost that properties were sold from older partnerships in 4–6 years at the maturation points of those partnerships, and that with ERNI, that was successfully occurring.

205. Ostrowoski also told Foremost that EPIC had homes carefully appraised, usually by SREA and AIREA appraisers, that the appraisers considered comparable properties, and that EPIC derived a fair market rent from these appraisals.

206. At the meeting with EPIC representatives on October 5, 1984, Whiteley received and reviewed a variety of informational brochures on the EPIC program, addressing issues in which Whiteley was interested, such as delinquency performance, track record, purchasing lenders, and profitability.

207. Whiteley received and reviewed the application from EPIC Mortgage, Inc. for Foremost to issue to it a Master Policy. On its application, EPIC Mortgage, Inc. represented, among other things, that it was approved by, among others, TMIC, MGIC, and RMIC.

208. At Whiteley's request, he received and reviewed, on or about October 26, 1984, a property acquisition worksheet provided by EPIC Mortgage, Inc., which showed how the RDC amount to be contributed by a builder/seller was arrived at. This was the presentation which Ostrowski had orally given him on October 5. He also received and reviewed a standard EPIC product loan issue.

209. Whiteley requested during the meeting at EPIC's offices on October 5, 1984 to see a partnership PPOM to confirm that EPIC was selling its limited partnership interests under the S.E.C. exception for private placement, not to undertake a detailed analysis of the memorandum. He later received and reviewed for that purpose a Partnership PPOM.

210. It was Whiteley's understanding from his visit to the EPIC offices in Falls Church, Virginia, and from talking with EPIC representatives concerning the property purchase formula and application of the rental deficit contribution, that the RDC would be applied to the purchase price to reduce the price of the property and lower the loan-to-value ratio of the mortgage loan from 95% to 80%. It was also his understanding that EPIC (as well as its affiliated companies) was profitable and growing. He knew that EPIC had never had any insurance claims or delinquencies. He was favorably impressed with the program and the people. He knew that some of the largest financial institutions in the country, including the Federal National Mortgage Association and PSFS, had purchased EPIC product loans and that numerous insurers had insured the product.

211. Whiteley and Schienle met at Foremost's offices on October 31, 1984 with Bruce North, Foremost's claims manager. At that meeting, the rental deficit contribution was described as an account contributing to the payment to cover the negative cash flow, and available to offset negative cash flow if the rents and the partnership contributions were insufficient to make payments. Mr. North understood that the RDC was to be held in separate accounts for each partnership.

212. As a result of the October 31, 1984 meeting, North was concerned about the "masking effect" that the use of the RDC would have on a default in the event other sources of cash were not available to make the mortgage payments. These concerns, and others, were directed into Foremost's

"conditions of insurance" letter, which was later sent to EMI on November 5, 1984. Foremost's claims department was to be notified by EPIC Mortgage, Inc. upon the advance of any RDC funds to make mortgage payments.

213. Foremost's letter also provided that EPIC loans were to be underwritten as an exception to Foremost's underwriting policy on a case-by-case basis. The following listed documents would be required to be submitted by EPIC Mortgage, Inc. for each loan it submitted for insurance:

Current appraisal

Purchase contract

EPIC's Rental deficit contribution worksheet

Rental/Lease Agreement

Note

Summary of the Limited Partnership to include:

Name (designation) of Limited Partnership

Number of properties

Dollar amount of issue

Number of Limited Partners

Geographic dispersion of properties

Types of properties

214. Certain of this requested information was subsequently eliminated through negotiation.

215. Following this review of the EPIC program, the documents and representations he had received, the results of this meeting and the "conditions" letter to be sent, Whiteley made the decision that EPIC product loans were acceptable risks for Foremost to insure.

216. On November 2, 1984 Foremost issued to EPIC Mortgage, Inc. a "Master Policy", allowing EPIC Mortgage, Inc., to submit for insurance EPIC Mortgage, Inc.-originated loans. The issuance of a master policy does not, itself, constitute a commitment to provide insurance.

217. EPIC Mortgage, Inc. is the named insured on the Foremost Master Policy, which states, in pertinent part, that "in reliance upon the statements made in the Application for Insurance and Attachments submitted by the Insured," Foremost agrees to pay any loss sustained by the insured by reason of a default in payment by the borrower, "subject to the conditions of the policy that follows."

218. Whiteley received EPIC Mortgage, Inc.'s first loan package submission on or about February 19, 1985. Because Whiteley had misunderstood the effect of the RDC—believing it to be a discount applied by EPIC to reduce the loan-to-value ratio of the loan—he rejected the loan for insurance.

219. In telephone conversations with Painter and Bossle of EMI after Foremost's rejection of the first submitted loan package in February 1985, the rental deficit contribution and its application was explained to Whiteley in greater detail. Bossle described to Whiteley in a telephone conversation of approximately one half hour, that the RDC was actually cash that was paid by the builder to the purchasing partnership at the closing and was put into a segregated fund to support negative cash flow on the loans in that particular partnership. Such amount was not applied to reduce the loan-to-value ratio of the loan. While he is not certain that the word "escrow" or "trust" were used, he was certainly led to believe that the RDC was a fund of the individual purchasing partnership held separately or otherwise segregated to support negative cash flow.

220. As represented, Whiteley believed the EPIC product loans were actually better risks than he originally believed since a pool of funds would be available to support negative cash flow on the mortgages, and that in a worst case scenario, the mortgage loans would be able to be paid for 16–20 months without any money coming in from limited partners or renters.

221. On or about February 27, 1985, Whiteley created and transmitted to EPIC Mortgage Inc. an application form for EPIC Mortgage, Inc., to complete and submit with each loan package it sent to Foremost to be insured. The application form was discussed at length in a telephone conference between Whiteley and Bossle after receipt by Bossle. Whiteley described in

detail the information he wanted filled out on each application, such as the name of the specific partnership, the RDC contribution to a "Deficit Fund" for each partnership, and monthly rental.

222. When completed, an application form indicated to Foremost the RDC amount which was represented by EPIC Mortgage, Inc. for each loan to be placed into a "deficit fund", that it was to be paid to the individual recipient partnership, and that it was to be segregated from any other partnership.

223. The RDC was not in existence when an application for insurance was sent to Foremost by EPIC Mortgage, Inc. or when a commitment of insurance was issued by Foremost to EPIC Mortgage, Inc., because the property closing had not yet occurred. To further satisfy himself as to the representations concerning the RDC, Whiteley received in each application package an "Exhibit A Addendum" to each purchase agreement, which listed the properties to be purchased by the partnership, and the RDC (by amount and by percentage) attributed to each property. Additionally, ¶ 4.7 of each purchase agreement stated that the Seller "shall pay to the purchaser" (the limited partnership) the stated RDC amounts as a contribution towards rental deficits.

224. Furthermore, Whiteley accorded to the EPIC loans the designation "PAM", or pledged account mortgage, where, in each case, the insurer relies on the representation of the lender that "pledged" funds are present in that pledged account. Defendants Silverado and PSFS are lenders with which Foremost insurers on the basis of pledged accounts.

225. Foremost issued its first commitment to insure an EPIC product loan on March 13, 1985 and its last commitment on July 27, 1985. In all, Foremost committed to and did insure 120 EPIC product loans during this period of time, with the greatest volume of insurance occurring in May to July 1985. Foremost's total assumed risk on such policies at the time of issuance of commitments was approximately $2.2 million. For each certificate issued, Foremost received the EPIC Partnership Application Form and the EPIC purchase agreement with Addendum A.

226. Foremost conformed with industry standards in its agreement to insure EPIC partnership loans.

227. EPIC Mortgage, Inc. purchased certificates of insurance from Foremost pursuant to the terms and conditions of Foremost's master policy issued to EMI in November, 1984.

228. After Whiteley negotiated the terms and conditions under which Foremost would insure EPIC product loans, and after he personally reviewed a number of the initial submissions, the underwriting function was transferred by him to a staff underwriter in Foremost's home office. This underwriter made sure that the rental deficit contribution amount appeared on every worksheet of the EPIC loan packages submitted for insurance.

229. On or about May 15, 1985, Whiteley transferred the underwriting function for EPIC product loans to Foremost's Hartsdale, New York office, after having established negotiated parameters with EPIC, and after having underwritten loans for eight weeks in its home office.

230. The underwriter in Foremost's Hartsdale, New York office checked applications for insurance to make sure that the rental deficit contribution was available to pay the mortgage obligations.

231. Only a small fraction of the premiums collected in payment for mortgage guaranty insurance is earmarked for underwriting. Rather, PMI's rely on the accuracy of the applications and collect premiums in anticipation of paying losses.

232. Mortgage insurers do not distinguish in underwriting between loans to be held by the originator and loans which the originator may assign or sell in the secondary market.

233. In June or July 1985, Bossle informed Strasser not to worry about the Maryland savings and loan crisis, that EPIC was "all right."

234. Foremost was informed of the impending default on all EPIC product loans on or about August 18 or 19, 1985.

235. Following the default at EPIC, in August of 1985, Mr. North traveled to the EPIC offices to review loan files and gather information about the rental deficit account. During Mr. North's investigation at EPIC, HUD–1 forms, which reflect payments made upon the closing of real property sales transactions, were also reviewed. Specific information sought to be reviewed by Mr. North at EPIC concerned where the rental deficit monies were and how much was left. He also wanted to know the amount of rents which had or had not come in, as well as limited partner contributions. Certain of this requested information was subsequently provided by representatives of EPIC Mortgage, Inc. No information was ever received by Foremost concerning the requested rental deficit contribution information.

236. On August 21, 1985, a few days after learning of the EPIC default, Foremost cancelled the EPIC Mortgage, Inc. Master Policy and all commitments which had not yet become certificates in force.

237. On November 7, 1985, less than three months after learning of the default, Hastings signed a letter rescinding the private mortgage insurance certificates and tendering to EMI the premiums paid, plus interest. Hastings had the authority to rescind the certificates.

238. Foremost has rescinded insurance on mortgage loans on the basis of fraud, prior to its rescission of insurance on the EPIC product loans.

239. Private mortgage insurance companies do not provide in their premium rates to cover for losses stemming from fraud by the insured. The premium structure is based on the assumption that claims will be denied in such cases.

240. Foremost does not distinguish, when it determines to rescind, whether a loan on which Foremost intends to rescind insurance is subsequently sold by the originator to a purchaser. This practice is consistent with industry standards.

241. Foremost commits to its customers to review and respond to an application for mortgage insurance within 24 hours. This is consistent with Foremost's competitors and with industry standards. Insurers determine that the required papers have been correctly completed and that the laws have met the agreed parameters. They assume the information presented is true.

242. Foremost's secondary market department was disbanded in the summer or fall of 1984, and therefore did not exist at the time Foremost became involved with negotiation over insuring EPIC product loans.

243. Foremost would not have insured EPIC product loan mortgages if it had been aware that EPIC routinely used RDC payments made by sellers to the partnerships to support the cash flow requirements of older partnerships and not the partnership which was the purchaser of the property which loan Foremost insured, that the partnerships were not truly separate and distinct, that EPIC was unsuccessful in selling properties and partnership interests, and the true financial condition of the EPIC companies.

244. Foremost would not have insured EPIC product loan mortgages if the Community and EPIC 1983 consolidated financial statement had shown no earnings for Community, or negative net worth for the companies.

245. United Guaranty's and Foremost's understanding that the EPIC partnerships were separate and distinct entities was not naive or credulous. There were legitimate, compelling reasons why the rental deficit contribution, partnership contributions and rents had to be held for the benefit of the particular partnerships which generated them. EPIC had told many others apart from United Guaranty and Foremost—including federal and state regulators—that its partnerships were independent entities.

246. In late October 1982, Robert Freedman (an attorney who provided legal services to EPIC and Community between 1982 and the default in 1985) prepared several draft opinions concerning the Maryland loans-to-one-borrower regulation, and

whether Community was required to aggregate the loans made to EPIC as general partner of the EPIC partnerships. The conclusion of the draft opinions is that, for purposes of the loans-to-one-borrower regulation, each EPIC limited partnership would be considered a separate entity under the regulation. An aggregation of those limited partnerships would not be required.

247. Richard Deerin stated that each limited partnership was a distinct and separate entity even though they had a common general partner. He believed that each partnership maintained separate and distinct bank accounts, accounting procedures, books, and records and that they could not draw on each other's assets. He was satisfied that none of the partnerships would be considered integrated for securities purposes. Deerin represented to outside counsel that the business functions of the limited partnerships were not interdependent, that loans to one partnership were not used for the benefit of other partnerships, and that the partnerships had separate operations and financial affairs.

248. On November 22, 1982 Freedman prepared for Community his *final* opinion on the Maryland loans-to-one-borrower regulation. Certain additional facts which appear in this final opinion include:

Although the partnerships are formed for the same purpose, all the partnerships are separate from and unrelated to each other;

In addition, the ability of one limited partnership to finance its projects is not dependent upon or subject to the ability of any other partnership to finance its respective project. Hence, each limited partnership is individually obligated to repay the mortgage on its own partnership property;

In the event a limited partnership would default on its loan, that default would not cause or create a default on any other loan made to another separate, independent limited partnership;

Finally, the borrowings of one limited partnership neither directly or indirectly benefit the other limited partnerships;

The revenues received by each limited partnership are not dependent upon the successful operations of the other limited partnerships. For example, each limited partnership does not derive any of its income from the activities of the other limited partnerships. Hence, the lender is not relying upon a single source of income for the repayment of the obligations of all of the limited partnerships; The loan proceeds extended to one limited partnership are not used for the benefit of accommodation of the other limited partnerships;

Although the limited partnerships have a common general partner they, in fact, are separate in their operations and financial affairs. For example, each partnership: .... (3) has an individual partnership bank account; (4) does not intermingle its assets and borrowings with any of the other limited partnerships ...;

249. For many of the above stated reasons, Freedman opined that the EPIC limited partnerships need not be aggregated for purposes of the Maryland loans-to-one-borrower regulation.

250. Freedman advised Deerin that the Maryland Attorney General might disagree with the conclusion reached by Freedman in his *final* November 22, 1982 opinion. Freedman advised Deerin that he wished to seek the Maryland Division of Savings and Loan Association's review of the opinion. Mr. Deerin did not authorize Mr. Freedman to send it to the Division. There is no factual basis in the record demonstrating that anyone at EPIC or Community sought a review by the Division of Savings and Loans of Maryland of Freedman's opinion.

251. It was necessary for the limited partnerships to be independent in order to avoid the registration requirements of the Securities and Exchange Acts. Registration of the EPIC offerings would have entailed significant additional expense to EPIC.

252. EPIC's partnership offerings were exempt from securities registration under Reg. D of the Securities Act. Under the rules promulgated by the SEC in connection with Reg. D, one or more offerings

could be "integrated" and the exemption from registration lost, if certain requirements were not met.

253. EPIC was concerned with the integration problem from the very beginning of its existence, and was therefore fully aware of the need to keep the funds of the various partnerships separate.

254. In 1978, EPIC's attorney wrote the Securities and Exchange Commission with a request for advice regarding the applicability of the integration rules to the EPIC partnerships. Mr. Cassidy, of EPIC, represented to the Securities and Exchange Commission at that time that each of the partnerships would have separate bank accounts, separate accounting systems, and separate costs of operation. Cassidy specifically stated at that time that "[t]here will be no commingling of funds between the partnerships." In reliance upon these representations, the SEC responded that the integration provisions would not apply to the EPIC partnerships.

255. EPIC made further representations to the Securities and Exchange Commission about the separateness of the limited partnerships with respect to the integration issue. In a letter dated July 14, 1983, EPIC stated that the partnerships were financially independent and that each maintained separate books and bank accounts and that the assets of the various partnerships were not commingled. EPIC included with this letter a copy of the integration memorandum it had previously received from Treadway at the firm of Dickstein, Shapiro and Morin. Based upon that letter, the SEC concluded that the EPIC partnerships did not need to be integrated.

256. The Treadway memo, which was ultimately forwarded to the SEC as an example of factors to which EPIC was adhering, contained the following observations following a survey of SEC no-action letters:

no need to integrate "provided that each partnership is financially and legally independent and the properties of each partnership are geographically and economically distinct";

"each partnership must be a 'stand-alone' entity ..." separate books and records, bank accts, and accounting system. "Commingling of assets or cross-collateralization among partnerships, or between a limited partnership and the general partner, are precluded;"

"Each partnership's funds must be used solely to purchase that partnership's assets and to finance that partnership's operations, and proceeds from the sale of interests in one partnership cannot be used to finance the operations of any other partnership or to create new partnerships."

"the general partner must not borrow money from the partnerships, especially to fund its or the other partnership's cash flow, make loans to other partnerships, or create new partnerships."

"the general partner must not borrow money from the partnerships, especially to fund its or the other partnership's cash flow, make loans to other partnerships, or create new partnerships."

"reflect partnership—by—partnership decision making."

257. EPIC spoke again to the separateness of the limited partnerships in a comment letter to the Federal Home Loan Bank Board which was prepared at the request of EPIC's General Counsel. In speaking to the loans to one borrow issue, EPIC stated that "Although the partnerships may be formed for similar purposes, the partnerships generally are separate from and unrelated to each other. For example, even though the independent partnerships may include a common general partner, the ability of one limited partnership to finance its project is not dependent upon or subject to the ability of any other limited partnership to finance its respective projects." The draft letter further stated that "[a] loan extended to one partnership having a common general partner with one or more other limited partnerships, does not benefit, either directly or indirectly, the other limited partnerships." This letter was sent in this form.

258. EPIC once again emphasized the separateness of its limited partnerships in a

draft letter to the chairman of the Federal Home Loan Bank Board. The letter stated that "[a]lthough the partnerships have a common general partner, each partnership is a separate legal entity owns separate partnership property, obtains financing for its own projects independent of other projects and is *not* liable for the obligations of any other limited partnership." *Letter from James B. Deerin to Richard T. Pratt,* dated January 26, 1983. That letter further stated, "[t]he limited partnerships I describe would have to be independent of and not liable for the debts of the other limited partnerships to which a common general partner belongs.... Thus, a failure of that limited partnership should have no effect on the assets of any other limited partnerships in which the common general partner has an interest." *Id.*

259. By October of 1984, Community was proposing to acquire another savings and loan association, which would have created a higher net worth for Community. This proposed acquisition would have had the effect of eliminating any federal loans-to-one-borrower violation, should Community have attempted to seek admission into the federal savings and loan insurance system.

260. EPIC repeatedly emphasized the separate and distinct nature of the limited partnerships it had formed to participants in the EPIC Program. For example, in a letter to Jon Andersen of U.S. Home Corporation, EPIC's general counsel stated that "[e]ach limited partnership is a distinct and separate entity, notwithstanding the commonality of general partners. Each partnership maintains its separate and distinct bank accounts, accounting procedures and books and records. There is no right of any limited partnership to draw upon the assets of any other partnership."

261. Mr. Bossle said that each partnership "stood on its own."

262. Mr. Neal, of Dominion, was unaware that the partnership contributions and rents received could be used for any purpose other than the partnership which owned the property. Mr. Neal was also unaware that the proceeds from one part-nership could be used to pay the debts of another partnership.

263. On April 9, 1984, Winner, of PSFS responded to a memorandum of another officer of PSFS which recommended that pool loans be underwritten as direct loans and that the loans be aggregated for purposes of credit. Winner rejected this recommendation regarding aggregation of credit because "each individual loan credit is nonrelated...."

264. Winner relied on conversations with EPIC officials regarding the financial resources of the limited partnerships to carry their mortgage debt.

265. A second area where the separateness of the partnerships was critical to EPIC lay in the Maryland savings and loan regulations regarding loans-to-one-borrower. Community, as a Maryland savings and loan, was often required to explain why its loans to EPIC partnerships did not violate these provisions. Its explanation was that its partnerships were stand-alone, separately administered entities.

266. The EPIC partnerships did not operate as separate entities. The funds of all partnerships were commingled in EPIC's general funds. EPIC and EPIC Mortgage deliberately hid the truth in order to keep the program running. The success of each individual partnership ultimately rose or fell on the success of the entire EPIC enterprise.

267. There was never really any cash in individual partnership accounts. Whatever cash there was in those accounts on a daily basis was swept into the EPIC account on a daily basis. (regular borrowings from partnerships).

268. The rental deficit contribution generated by a particular partnership never went into that partnership's bank account. At settlement, whatever rental deficit contribution there was would be wired to EPIC's corporate bank account. Once in EPIC's general corporate account, the rental deficit contribution funds were commingled with all the other funds in that account and were used for whatever purposes EPIC's general funds were used.

269. While the partnership rent collected by ERSI went into a partnership account, this was only temporary. There was a system by which the partnership accounts were swept each day and the funds were passed up to EPIC.

270. The same held true of the partnership contributions. Those funds were cleared into EPIC's general funds in a day or less if there was a positive balance in a partnership account.

271. The effect of sweeping the cash from the limited partnerships to EPIC's general funds was to make each of the partnerships dependent on each other and the general partner. It negates the statement that the partnerships stood on their own.

272. On September 3, 1982, Stern advised Mathias, Billman, and Deerin by legal memo that there would be no securities integration problem if rental income for all of the partnerships were deposited into a single account controlled by ERSI, to be used by ERSI as *manager* of the properties. However, if EPIC would use these funds for general corporated purposes, a court could find that the partnerships were financially interdependent. If a court made that finding, the limited partnerships would be integrated under securities laws.

273. When the funds were taken from a partnership and put into EPIC's general account, there was no decision-making process about whether it would be a good idea for this partnership to lend money to EPIC. There was no discussion at EPIC Board meetings about the wisdom of these borrowings, or whether EPIC's fiduciary duties permitted them.

274. These regular and systematic appropriations of funds from partnerships, without documentation and without consideration of the economic effect on the "leading" partnership, was in clear violation of EPIC's fiduciary duty to its partnerships. The PPOMs make repeated references to EPIC's duty to "exercise good faith and integrity in dealings with respect to affairs of the partnership...."

275. EPIC took the general commingled funds and advanced them to other partnerships based solely upon various partnerships' needs for funds in order to avoid defaults throughout its existence.

276. The general funds came mostly from EPIC's activity of acquiring houses and syndicating new limited partnerships, in the form of builder fees and rental deficit contributions and limited partner capital. At all times until August 1985, if a limited partnership needed money to pay its monthly bills, EPIC would advance the money. This included EPIC's in-house partnerships.

277. EPIC felt that it would hurt the overall enterprise to allow one partnership to default. Clearly, if such an event were to occur, EPIC would have to terminate its formation of partnerships and their purchase of properties. This in turn would mean that EPIC would no longer be able to generate the funds to fuel its earlier formed partnerships.

278. EPIC also used its general funds to make payments to EPIC Holdings, Limited, its parent company, pursuant to a tax allocation agreement. Approximately $15 million to $16 million was paid up in this manner in 1983 and 1984. That company was owned by Tom Billman and Clayton McCuistion. Mr. Mathias believed that this agreement was not in EPIC's best interest and he complained about it to Mr. Billman.

279. EPIC never indicated any problems in selling the limited partnership units which created the second critical component of the partnership's cash flow. To the contrary, EPIC worked very hard to create the impression that people were "knocking down their doors" to buy these units.

280. Kipp told customers and private mortgage insurers that the EPIC program involved liquidating properties at the maturation points of the partnerships. He constantly asked people at EPIC if EPIC was liquidating properties on schedule. He was given general assurances that EPIC was on schedule. Kipp did not know how many houses EPIC was selling and never told any lenders that EPIC was having trouble selling properties.

281. Mr. Walde, of Dominion, understood that EPIC was having an excellent experience in selling homes out of maturing partnerships. He would have been concerned had it been otherwise, "because everybody looks to the sale of the product to get out of the [the] loan".

282. Mr. Neal also understood that EPIC's sales of homes for maturing partnerships was relatively successful.

283. Dominion Federal was not informed by EMI or any EPIC-related entity that any of the property serving as collateral for the EPIC product whole loans purchased by Dominion Federal was sold from one EPIC partnership.

284. Mr. Bossle indicated no difficulties in disposing of the properties. There was no disclosure of any kind of difficulty in selling properties coming out of older partnerships. With respect to the sales of homes, Mr. Bossle stated that the partnerships were just starting to roll out of the old partnerships.

285. Winner, of PSFS, was informed by representatives of EPIC Mortgage, Inc., and relied upon such representations, that sales of partnership units would generally only lag sales of pools of loans to third party financial institutions by three to four months.

286. Mr. Gillison was affirmatively told that EPIC was doing fine in selling partnership interests to investors.

287. Mr. Bossle indicated no difficulty selling limited partnership interests. He said they had been successful for a long period of time and were doing well.

288. Despite the fact that EPIC was no longer actively marketing partnership units for sale in mid–1985, it continually reassured United Guaranty that the partnership formation mechanism was proceeding in an appropriate manner. By a letter dated May 21, 1985, EMI indicated that it was continuing to form partnerships.

289. In both 1984 and 1985, however, EPIC was having difficulty selling regular partnership interests.

290. The EPIC partnerships which were actually syndicated during these years had a shortfall of some 26 percent of the expected investor contributions.

291. EPIC created a partnership known as "Goliath I" specifically for the purpose of receiving unsold partnership units.

292. EPIC created "pac-man" partnerships to purchase unsold units and to subsequently syndicate them. For example, a pac-man partnership purchased 61 percent of EPIC Associates 83–L.

293. A pac-man partnership essentially gobbled up unsold units of another EPIC partnership. This only delayed the problem, however, because those units still needed to be sold out in the marketplace. This was simply a deferral of the inevitable.

294. Approximately $9.7 million worth of partnership units were acquired by the pac-man partnerships in 1984. Nearly $15 million worth were sold in total to EPIC itself, its affiliates and other EPIC partnerships (including pac-man partnerships).

295. Another route EPIC began to follow because of its difficulty in selling partnership interests was to market "expandable partnership interests". This began in February 1984.

296. Under this arrangement, there was a different class of partners making the capital contribution in each of the four years of the partnership. Essentially, EPIC then had to resell each one of these partnership units four times instead of one time up front.

297. In early 1985, EPIC completely ceased its marketing of limited partnership units. According to the then Director of the Department preparing EPIC's PPOM's, there were basically no new limited partnership PPOM's generated by EPIC after February 1985. EPIC filed notices of sale for only two new partnerships with the SEC in the first eight months of 1985.

298. Over $150,000,000 in property was bought for EPIC partnerships in March through July 1985. That was enough to justify syndicating limited partnerships, but no new partnerships were syndicated in that time.

299. Despite the fact that EPIC was no longer actively marketing partnership units for sale in mid-1985, it represented repeatedly that the partnership formation mechanism was proceeding in an appropriate manner. For example, by a letter dated May 21, 1985, EMI indicated that it was continuing to form partnerships *Letter from Kim Trombley to Kerry Rainey*, dated May 21, 1985. In July 1985, United Guaranty was told that ten partnership offerings were "in the works" and would be available shortly. *Letter from Kim Trombley to Kerry Rainey*, dated July 31, 1985. There is no evidence that these offerings were ever prepared.

300. The most significant use of EPIC's general funds was to make advances to other EPIC partnerships. These advances were necessary because EPIC was unable to sell the homes owned by these earlier EPIC partnerships.

301. As the EPIC program was structured, it was intended that the partnerships would own the houses for four to five years and that the homes would be sold at the conclusion of that period. This was necessary for the EPIC concept to work and, in the words of Mr. Meltz, to "validate the EPIC concept". Without selling homes, EPIC would be unable to persuade new investors to buy units in newly formed partnerships.

302. Gene Isaacs, the President of ERSI, stated that "[t]he ultimate goal in EPIC's resale program should be to achieve a system whereby 7,000–8,000 homes a year can be sold." *Memorandum from Isaacs to Frazier*, dated November 5, 1984. He felt there was a need for EPIC to reach an equilibrium between the homes it bought and the homes it sold. EPIC never came anywhere near this goal. The actual sales of houses out of older EPIC partnerships in 1983 through 1985 were a small fraction of EPIC's 1981 projections for dispositions during these years. EPIC was not bringing the partnerships full circle. This severely strained and ultimately toppled the entire enterprise.

303. It was not sufficient for EPIC to merely sell the properties at their fair market value. In order to validate the EPIC concept, EPIC had to generate sufficient cash to repay the mortgages, the advances by EPIC, and the limited partnership contributions. EPIC needed a record of success in this regard in order to be able to continue to sell limited partner interests.

304. The issue of EPIC's ability to sell homes was frequently discussed at meetings of the Securities Policy Committee. At one such meeting, Mr. Moorstein asked why EPIC did not sell the properties at a lower price. Lenny Meltz responded that EPIC did not because if they did not sell at an adequate price, "it would not validate the [EPIC] concept." To sell at a lower price would have had an adverse effect on future investors. In other words, future investors would not have the confidence that EPIC was a viable organization.

305. EPIC's goal in selling homes was thus to arrive at a "breakeven price"—the price it would take to pay back the mortgage, repay advances and repay capital contributions of limited partners. EPIC knew that it needed an annual appreciation rate of approximately 10 percent to reach this point. EPIC also knew, however, that the average annual appreciation rate it was getting on the homes it was able to sell through resyndications was a mere 2.15 percent.

306. EPIC knew it was not getting the appreciation it needed because of the current market analyses (CMA's) it received. These represented the "best guess" by a local real estate agent as to what the home would sell for if it was put on the market. The CMA's were done to determine whether a house could be sold in a fashion that would enable the partnership to repay EPIC's advances and return limited partner capital.

307. EPIC was concerned about its problems in selling properties in maturing partnerships as early as the fall of 1983.

308. A review of the properties selected for potential resale in September 1983 indicated that the vast majority produced a current market analysis less than the necessary "breakeven" for EPIC.

309. On March 9, 1983, Meltz of EPIC told MGIC that EPIC anticipated sales of 600 properties from existing partnerships. Meltz agreed that it was necessary to sell 600 properties to show that EPIC could dispose of houses out of mature partnerships. On August 11, 1983, Meltz admitted that sales did not approach this level.

310. On August 11, 1983, representatives of MGIC and EPIC met in EPIC's offices. MGIC told EPIC that it wanted to back away from insuring non-owner occupied investor loans because of the volume of production homes versus model homes and EPIC's lack of sales from previous partnerships. MGIC told EPIC that it would not insure any new production homes. EPIC was afraid that if other mortgage insurers heard about MGIC's decision to back away, they would not insure EPIC product loans either. MGIC told EPIC that it would not tell other mortgage insurers. MGIC agreed that if anyone asked, it would tell them that MGIC was still insuring production homes for EPIC.

311. EPIC's current market analyses were constantly coming back below the values needed for EPIC to break even on these sales. For example, on EPIC Partnership 80–03, EPIC's breakeven was $1,840,625.00, but its current market analysis came back at only $1,423,539.00. *Memorandum from Donna McGiehan to Ben Graham*, dated October 24, 1983. On Partnership 80–08, EPIC's breakeven point was $1,968,446.00, but its adjusted CMA was only $1,357,636.00. *Memorandum from Jan to Ben*, dated October 12, 1983. These shortfalls were the rule, not the exception.

312. These problems continued when EPIC attempted to actually sell the homes. In an overwhelming number of instances where properties were appraised for resale, the appraisal price would come back at either the same or less than what the home was originally purchased for. The appreciation was not there.

313. Because of its difficulty in obtaining sufficient sales prices to reach the breakeven point, EPIC was repeatedly placed in the position of requesting appraisers to increase their original valuations on the homes for sale. *Memo from Patti Jones to Cheri Williams*, dated December 11, 1984; *Memo from Cheri Williams to Patti Jones*, dated December 20, 1984; *Memo from Patti Jones to Cheri Williams*, dated December 21, 1984, (all memoranda requesting that appraisal values be raised). These requests for appraisals to be raised became so frequent that they were turned into form letters.

314. While Ms. Jones was coordinator of the Resale Unit, through February of 1985 until she was dismissed, EPIC ordered its resale appraisals through Continental Appraisal Group. Once the contract price was set for resale, EPIC would try to obtain an appraisal to meet that price; if unable to do so with the first appraisal, it would ask for a new appraisal. In some cases, EPIC got as many as three or four appraisals on one property.

315. It occurred to Delores Dean that EPIC partnership properties might be worth less than their purchase price when, in the spring of 1985, EPIC tried to sell houses and the contracts that they were able to get were at much less than the original purchase price.

316. Ms. Barthello, the head of EPIC's Investor Relations Department, discussed with EPIC President Ron Frazier the fact that EPIC was not experiencing enough appreciation to sell the properties at a breakeven. She questioned why EPIC was continuing to purchase properties if it could not sell the old properties.

317. Originally, Asset Management listed houses from the oldest partnerships. Selection was based on which houses Asset Management thought would sell best and which ones had recent pictures in the file. The prices for these houses were based on a Current Market Analysis.

318. EPIC's comprehensive study of the salability of its inventory of homes was referred to as the "Blue Book." Generated in September 1984, the "Blue Book" involved approximately 1,100 of the 15,000 to 18,000 properties under EPIC's management. It evaluated the financial effects of selling the homes owned by these partnerships based upon the higher of two apprais-

als received on each home. It included not only EPIC's early "income" partnerships, but also five of EPIC's later "tax" partnerships. The Blue Book indicates that in each of those five partnerships, the advances by EPIC could not be repaid in full.

319. The figures in the Blue Book were based on the highest appraisal for each property. It shows that, after selling properties, paying back advances by the general partner, paying off the mortgages, paying selling costs of 4%. and returning capital contributions to the limited partners, most partnerships would show negative cash available.

320. *The Blue Book* showed that EPIC was not working. It illustrated that 60 percent of the limited partner capital contributed for the 80 partnerships identified in that document would not be returned to the limited partners.

321. The Blue Book was presented to EPIC's Disposition Committee—including Messrs. McCuistion, Meltz, Frazier, Mathias and Ms. Gyure—on or about September 6, 1984. After detailed discussion, the resolution of the Committee was to instruct Ms. Gyure to collect all copies of the Blue Book and *physically destroy them.* This decision was reached because of concern that if the results of the Blue Book became known, EPIC's ability to attract limited partners for· new syndications would be harmed. In particular, Mr. Frame (head of ESI) was concerned about EPIC's track record of closing out old partnerships; and the Disposition Committee was concerned that Mr. Frame would simply quit his job if the Blue Book results became known to him.

322. In August or September of 1985, as EPIC was collapsing, Mr. Mathias found out that a copy of the Blue Book still existed and was in the possession of Mr. Holmberg. Mr. Mathias instructed Mr. Holmberg to destroy it.

323. In May 1981, EPIC represented to its limited partners that it was "beginning to sell houses at premium prices...." *Letter from Tom J. Billman to EPIC Limited Partner[s],* dated May 13, 1981. The very next month, however, Mr. Billman wrote to the investors in EPIC Associates XVIII, and stated that EPIC would begin to sell the homes owned by the partnerships "[w]hen the real estate market stabilizes." *Letter from Tom J. Billman to All Investors in EPIC Associates XVIII,* dated June 5, 1981.

324. Over the ensuing years, EPIC continued to hold homes and continued to attribute its decision to "market conditions" *Letter from Lenny Meltz to Limited Partners in EA 80–02,* dated January 31, 1984. It is apparent, however, that the real reason it made no sales was because it could not recoup its "breakeven prices."

325. Even as it was holding homes, however, EPIC was actively attempting to develop a method to sell its ever-expanding inventory of homes.

326. EPIC was concerned about its problems in selling properties in maturing partnerships as early as the fall of 1983.

327. The resale program was accordingly a "major priority" of EPIC in 1983. EPIC was striving to develop a system that would allow it to sell homes on a regular basis "in virtually any economic environment." The initial resale goal was 600 houses. *Memo from Meltz to All Employees,* dated August 23, 1983; Memo from Meltz to Frazier, *dated July 25, 1983.*

328. During 1983, approximately 500 to 600 houses were listed for sale with ERSI. *Memorandum from ESI to WRF, et al.,* dated May 27, 1983.

329. An additional 1,500 homes were under assessment for 1984 marketing as early as August 1983. *Memorandum from Bob Kemp to Frank Bossle, et al.,* dated August 5, 1983.

330. EPIC never came anywhere near reaching its 600 house goal in 1983. Seventeen homes were sold in that year, other than the homes that were resyndicated. This was less than 3 percent of EPIC's own goal. This was known to EPIC officials in December 1983.

331. Resale efforts continued into the next year. EPIC wrote its limited partners that EPIC's "number one priority in 1984"

was to close out its partnerships and return all capital to its limited partner investors. *Letter from Lenny Meltz to Limited Partners in EA 80–02,* dated January 31, 1984. This letter was sent to all limited partners.

332. EPIC told CMAC, another mortgage insurer, in late 1984 that "they were stepping up their activity" in selling homes out of partnerships.

333. Despite the more than 2,000 homes it was seeking to sell in 1983 and 1984, in November 1984, EMI represented to United Guaranty that "Epic does not have that many homes to sell initially." *Letter from Frank Bossle to Bud Gillison,* dated November 26, 1984.

334. The 1984 goal for the sale of houses was not met. During the three-year period ending December 31, 1984, only 55 homes were sold to third parties. Four hundred sixty-one homes were resyndicated during this time period. Resyndications were not true sales.

335. The "ultimate solution" to the problem of selling EPIC properties was intended to be ERNI, an acronym for EPIC Residential Network, Inc. ERNI was established in early 1984. The gravity of its task was illustrated by the fact that ERNI's President, Joel Bernstein, was offered a $1 million cash bonus if ERNI could sell 10,000 homes in three years.

336. The Asset Management Department at EPIC was headed by Linda Gyure. Asset Management was responsible for selecting houses out of partnerships, pricing them, and listing them with ERNI for sale.

337. Asset Management began to list properties with ERNI in the spring and summer of 1984.

338. ERNI attempted to structure sales of EPIC properties to the new investors so as to give the new investors an after-tax break-even of zero.

339. After sales efforts based on "CMA" values had failed, EPIC commissioned and perceived, in the spring and summer of 1984, appraisals on the houses in the oldest EPIC partnerships. This was not done through Continental Appraisal Group, but rather directly by the Asset Management Department under Linda Gyure's supervision. In instances where two appraisals were ordered on the same property, significant differences were noted, and so the decision was made to obtain two appraisals on each property, and for most properties, two appraisals were in fact obtained. As their appraisals were received, houses were listed with ERNI (again selected to obtain supposedly saleable houses and acceptable results) at the higher appraisal value; but as before, sales were slow and goals were not met. This was despite efforts to subsidize those sales through a program for Community to offer below-market financing for ERNI sales and a program to guarantee a certain level of rent to the purchaser.

340. EMI decided to provide $5,000,000 to fund mortgages on properties sold by ERNI. Rates could be brought down to below market rates. This was done to facilitate sales by ERNI.

341. In the spring of 1985, when ERNI was trying to sell homes, the contracts that it got were at much less than the original purchase price.

342. EPIC established a subsidy contract program to attract purchasers of homes from ERNI. Under the program, EPIC would guarantee the purchaser that he would receive a certain market rent on the property for five years after the sale of the property.

343. Low appraisals were a frequent problem with EPIC attempts to resell partnership properties. It occurred "the majority of the time" and was one of the biggest reasons that ERNI contracts fell through.

344. ERNI received appraisals on the properties that were substantially different from the values that it was placing on the properties.

345. ERNI did terribly from the start. It was struggling to compete in the marketplace. ERNI's problem stemmed from the fact that it was restricted in its ability to offer properties at a competitive price, since it was charged with "validating the EPIC concept."

346. Mr. Kemp testified at trial that ERNI was projected to sell 50 to 100 properties in 1984. This is contradicted by EPIC written internal projections of 1,000 homes. *Memorandum from ESI to ERSI Staff,* dated January 27, 1984. This projection increased ambitiously in 1985. Dan Lindley, who was the Executive Vice-President of ERNI Mortgage, Inc., testified that ERNI's initial goal for 1985 was to sell 6,000 homes. Community's own internal projections for ERNI projected 1,800 sales in 1985, increasing to 3,000 in 1986 and 4,500 in 1987.

347. ERNI sold 12 homes in 1984.

348. ERNI was ever optimistic, however, in its public projections of the homes that it would sell. For example, an article in the *Milwaukee Sentinel*'s business section stated that ERNI officials were projecting sales of 8,000 homes in 1985. The article furthermore stated (erroneously) that ERNI had sold approximately 3,000 units during its first year (1984). These representations were made at an ERNI seminar in Milwaukee in April 1985.

349. A MGIC employee who attended that seminar also recorded that ERNI had sold 3,000 homes in 1984. ERNI personnel further represented at this meeting that they were selling approximately 400 properties per month *Memorandum from David Totzke to File,* dated April 10, 1985.

350. Despite all of ERNI's efforts, by mid–1985 there were 87 EPIC partnerships formed in 1980 or before which had not sold their homes.

351. Andrea Barthello was EPIC's liaison with its limited partners. Between 1981 and 1985, she was constantly being asked "[w]hy aren't you selling the properties in my partnership?" She received letters and telephone complaints from limited partners about EPIC's failure to sell homes.

352. Lenny Meltz, the President of EPIC at that time, had received a number of complaints from partners asking to get out of mature partnerships.

353. There were numerous complaints by investors and broker dealers regarding EPIC's performance in selling homes. One broker wrote of his difficulty in getting "any information, or even a direct, honest answer from you [sic] regarding the status of [Partnership 80–02]." *Letter from Crag Cordial to Ron Frazier,* dated January 3, 1984.

354. Thomson–McKinnon complained again in a letter to Lenny Meltz dated June 8, 1984. A third inquiry was received from Thomson–McKinnon in January 1985, from its senior vice-president in its real estate department.

355. EPIC's policy was to evade questions and complaints.

356. The level of complaints from limited partnership investors accelerated to the point that EPIC considered it possible that a class action would be filed against EPIC because of the failure to sell homes and the advances to the partnerships by EPIC. *Memorandum from Julia Beecher to Jack Strobel,* dated February 28, 1985.

357. In June 1984 EPIC elected to re-syndicate all the houses owned by its early "income" partnerships because it was unable to sell partnership homes on the open market. This involved approximately 961 houses. *Memo from Lenny Meltz to Bob Kemp,* dated June 1, 1984.

358. When EPIC resyndicated a property, it sold houses from existing partnerships to newly formed partnerships.

359. EPIC did try to market the properties it resyndicated in 1983 on the open market, but it was unable to do so. EPIC could not obtain the price that it needed on the open market.

360. EPIC intended to resyndicate 374 properties by December 1, 1983. *Memorandum from Ben Graham to Ron Frazier,* dated November 4, 1983. Ultimately, 461 properties were resyndicated.

361. One reason EPIC did resyndications was to facilitate a track record of closing partnerships.

362. All that resyndications accomplished was to move the difficulty in selling the homes to a future time. EPIC was not closing the partnerships in the manner which had been projected in the offering.

The resyndications were not a solution to the problem. They masked the true problem.

363. Even resyndications did not generate enough proceeds to return limited partner capital.

364. There was no rental deficit contribution for the properties which were resyndicated. The placement of resyndicated properties into an EPIC partnership had serious economic effects on the viability of the partnership. EPIC was concerned about its reputation if knowledge of its resyndications became widespread. A handwritten note by Frank Bossle states, "Afraid traders are disclosing resyndications."

365. EPIC had difficulty selling partnerships consisting of resyndicated properties.

366. Later, the decision was made to spread the resyndicated properties around to different limited partnerships in order to minimize the negative economic consequences of resyndicated property.

367. If EPIC held properties beyond the expected life of the partnership, the partnership would become completely dependent upon the rent it was receiving (which was inadequate to totally cover the mortgage) and advances from EPIC. Partnerships in fact became dependent on EPIC. Without advances, these partnerships would have defaulted. EPIC's consistent policy was to make needed advances.

368. The cost of EPIC's decision to hold homes was that there would be certain partnerships which would require advances from EPIC as general partner. During this period, EPIC advanced significant sums to EPIC partnerships, which caused it "great internal strain."

369. EPIC's inability to sell homes resulted in ever-increasing cash needs to keep EPIC alive. If at any given time the cash was not coming in the door to keep the enterprise alive, the entire EPIC operation would collapse.

370. EPIC's inability to sell homes at the end of the anticipated four-to-five year period created a continuing cash drain upon the general financial resources of EPIC as general partner. As Community Savings and Loan noted in a draft letter to its accountants, dated February 18, 1985:

There is one major factor that is an inherent part of all tax shelters; inevitably, any tax shelter will "burn out." ... The question is not "if" burnout will occur, but rather "when" it will happen. The "when" it will has arrived for a number of EPIC's early generation tax shelters forcing Community Financial Services, Inc. (CFSI) to explore the avenues available to allow for exhausted partnerships to dispose of partnership property.... Where a partnership has run its economic life, capital contributions to cover the operating expenses and debt service partnership property are still required from the General Partner. Only disposal of the property for property resyndication will lift the continuing losses and continuing cash drain from the General Partner.

371. EPIC made advances to partnerships that could not cover mortgage payments through rent, the RDC, and capital contributions. EPIC used its operating funds to make these advances.

372. EPIC also used its general funds to make advances to the limited partnerships. The general funds came mostly from EPIC's activity of acquiring houses and syndicating new limited partnerships, in the form of builder fees and rental deficit contributions and limited partner capital.

373. At meetings of the Disposition Committee, and especially the Securities Policy committee, people expressed concern about EPIC's ability to dissolve the older partnerships. Frame in particular was concerned, because it was hard to sell new limited partnership units without a proven track record. Gyure and Mathias were also concerned because EPIC had to make advances to these partnerships every month.

374. On July 1, 1985, Jay Zwatsky wrote a memo to the Securities Policy Committee in which he expressed concern that EPIC would not be able to convince a tax

court that EPIC believed there was enough value in a limited partnership to support the advances that EPIC made to the limited partnership.

375. During the period when EPIC was consciously not selling homes, it continued acquiring new homes at an ever-increasing rate. This led Ms. Barthello to characterize EPIC as a "snowball." At one point, Ms. Barthello told Larry Mathias and Linda Gyure of EPIC that EPIC seemed like a pyramid. They did not challenge that statement and offered no solutions.

376. When EPIC was unable to sell properties according to its projections (and thereby relieve itself from the mortgage debt load of these properties), it chose to acquire more properties to generate the cash to pay the old mortgages.

377. In some undated, handwritten notes, Frank Bossle of EMI wrote, "[h]ow much business do we have to do to keep the ball rolling."

378. By June 1982, EPIC's financial condition was "weak" due to the high level and the character of EPIC's notes receivable.

379. By June 24, 1983, EPIC had a lack of liquidity and MGIC was concerned about it.

380. As of December 31, 1983, and in the surrounding time-period, EPIC's need for cash was growing at an enormous rate. According to a document prepared in part by EPIC personnel in the summer of 1985, as of December 31, 1983, EPIC's cash needs (to keep the partnerships then in existence from defaulting in the next four years) were $18.3 million.

381. As of December 1983, the partnerships in existence needed an additional $183 million in cash to keep them going through 1987.

382. In April 1984, Tom Lindahl of EPIC did a study that indicated that EPIC needed approximately $100 million worth of equity to stay afloat.

383. EMI set a goal to sell $100 million worth of loan servicing in 1985. Additionally, in March 1985, EPIC was negotiating the creation of a Real Estate Investment Trust to raise $50,000,000.

384. EPIC Holdings incurred a net loss of $7,274,476 for the first four months of the fiscal year ending April 30, 1985, as opposed to positive earnings of $20,101,540 and $13,562,887 for the fiscal years ending December 31, 1984 and 1983, respectively.

385. This loss, coupled with the stripping of the organization on February 28, 1985 of companies with a net book value of $31,802,780 left Epicenter and EPIC Holdings with a deficit net worth of $(13,009,-204) and $(13,043,718), respectively, as of April 30, 1985.

386. PSFS was informed by Salomon Brothers, when Salomon Brothers was asked by Bohley of PSFS, to act as agent for a sale of EPIC product loans held by PSFS, that Salomon Brothers had a "problem with the way that EPIC was doing business because of its cash flow." This representation was reported to Winner in spring or early summer, 1985 by Bohley.

387. The uses of the monies in EPIC's general funds included the following: (a) advances to older EPIC limited partnerships whose book credits for RDC, rent, and limited partner contributions were no longer adequate to pay the partnership's monthly expenses; (b) advances to in-house partnerships; (c) payments to EHL pursuant to the "tax allocation agreement"; (d) payments to EHL pursuant to the management agreement between EHL and EPIC; and (e) payments to a company owned by Mr. Billman and others, for casualty insurance in the partnership houses.

388. Monies were paid out of EPIC's general funds to EHL pursuant to a "tax allocation" agreement. In 1983 and 1984, those payments amounted to $15 or $16 million. EPIC obtained no benefit from this agreement.

389. The In–House Partnerships Drained Cash From EPIC and Community. An "in-house" partnership is a partnership that top-level employees were allowed to invest in. Members of the public had to make a cash down payment to invest in a limited partnership. Employees who invested in "in-house partnerships" were re-

quired to make an investment only in the form of promissory notes.

390. The EPIC "in-house partnerships" included partnerships 100-A, 80-XX, 81-XX, and 85-XX. By September of 1985 these partnerships owned several thousand houses. The limited partners in those partnerships were EPIC/Community executives. Unlike partners in EPIC's typical partnerships, partners in the "in-house partnerships" put in only nominal cash contributions.

391. "In-house partnerships" were partnerships set up for people within EPIC. Kipp was a partner in two of them. However, he was not required to put up any money. He signed notes for his interest in the partnerships.

392. The deductions taken by these executives on their tax returns, reflecting losses of these partnerships, reached multiples of 3000 times their investments. In addition, very substantial cash was distributed to the limited partners of the "in-house partnerships", on at least some occasions, when houses were purchased by these partnerships. As a result of the foregoing, the "in-house partnerships" required both earlier and greater advances, to keep those partnerships from defaulting on their obligations. EPIC's general funds were used to make all necessary advances to these partnerships. For only one of the "in-house partnerships", 85-XX, the cash drain to EPIC's general funds approximated $3.7 million in 1984.

393. On or about September 17, 1984, EHL prepared a document entitled "EPIC Holdings Limited projected 1984 losses for EPIC partnerships." The partnerships reflected in this summary are 80-20, 81-20, 100A and 85-20. For each partnership, the schedule lists the partner, the percentage of losses available to the partnership which are allocated to each partner, and the total dollar value to losses allocated to each partner. The document also contains total projected losses for each of the listed partnerships. Total projected losses for EPIC partnership 80-20 were approximately $3,200,000; for 81-20, approximately $2,000,000; for 100A, approximately $1,900,000; and for 85-20, approximately $4,500,000. Total projected 1984 losses for 80-20, 81-20, 100A and 85-20 were in excess of $11,800,000.

394. With respect to "in-house partnerships", EPIC frequently had problems getting appraisals high enough to cover the mortgage balances. In-house properties were regarded as old and "not very good."

395. The pyramid nature of EPIC's operations was confirmed on August 27, 1985 when representatives of Silverado Banking and other certificateholders met with EPIC regarding the default. EPIC outlined the cash funds necessary to continue the EPIC operation, and its need to acquire new properties to generate sufficient revenues to meet its existing obligations.

396. EPIC's and Community's consolidated and financial statements were false and misleading. For the year 1983 Community and its consolidated subsidiaries (including EPIC and EMI) were audited by Fox & Company; and for the year 1984 by Alexander Grant (now known as Grant Thornton), which had absorbed Fox & Company. The auditors' methodology for evaluating the collectability of receivables, from the EPIC limited partnerships, relied upon the assumption that the houses in EPIC's partnerships had appreciated in accordance with national averages—*i.e.* 14.9% in 1978–1979; 6.4% in 1979–1980; 8.6% in 1980–1981; 1.1% in 1981–1982; 6.6% in 1982–1983; and 2.6% in 1983–1984.

397. Financial statements are the responsibility of management. EPIC's auditors erred in their method of determining whether EPIC's advances to its partnerships were collectible.

398. The facts known to EPIC management provided no evidence that such appreciation rates had been obtained, but rather indicated the contrary. In addition, EPIC management failed to inform the auditors: about the preparation or existence of the Blue Book; that houses would not be sold unless they met a price which would tend to establish a good track record of the average appreciation rate (less than 1%); evidenced by the resyndications in 1983, that resyndications were resorted to be-

cause satisfactory prices could not be obtained in arms-length transactions; that an analysis in September of 1983 of "properties selected for resale" showed that only 20 of 99 could be sold at a "break-even" rate; that it was EPIC's policy to advance all necessary funds to older partnerships, in order to avoid problems with new syndications; or that EPIC employees were discussing among themselves concerns that EPIC was a "pyramid".

399. By its failure to take into account and reflect the true facts about EPIC's operation as of December 31, 1983, the financial statement was misleading. The statements were the responsibility of management.

400. The financial statements of Community Savings & Loan and its consolidated subsidiaries (including EPIC and EMI) for the year ended December 31, 1983, were false and misleading. Those statements showed the EPIC group of companies as healthy and viable, when in fact they were not. Those statements carried, as an asset, $41,426,672 of receivables due to EPIC from the EPIC limited partnerships—a highly material figure which was recognized by the auditors as "the foremost audit risk."

401. EPIC was not the typical home buyer who must pay cash out-of-pocket to purchase a home. When an EPIC partnership purchased properties, that actually produced revenues in the form of rental deficit contributions. This was generally 16% to 20% of the purchase price of the home. Funds also came to EPIC by way of builder fees, which were 6.8% to 10% of the purchase price of the homes. This cash went into EPIC's general funds. These funds then were used to make advances to existing EPIC partnerships.

402. Community's availability as a source of funds for advances diminished the spring of 1985. This made funds generated by acquisitions more important.

403. EPIC could not sustain the acquisition goals it had set for itself. EPIC expected $40 million in acquisitions in each of the first three months of 1985. It fell short by $54 million. It is reasonable to assume that this $40 million per month pace was expected to continue through the second quarter of 1985, given EPIC's 1985 acquisitions goal of $500 million (which was originally $600 million). EPIC's shortfall over the second quarter of 1985 was $34 million.

404. EPIC's failure to meet its acquisition projections in early 1985 created difficulties for it in meeting commitments it had made to sell loans it had originated to other financial institutions. *Memorandum from Bob Kemp to Lenny Meltz*, dated February 13, 1985. This created costs for EPIC.

405. For example, when EMI was unable to fill a commitment for PSFS, Community agreed to pay PSFS the interest shortfall equal to the difference between the federal fund borrowing rate and the rate on the pass-through certificate for the number of days extended. Letter from Bossle to Winner, dated February 25, 1985. This 39–day extension cost Community and EMIL over $120,000.00.

406. EPIC's failure to meet its 1985 acquisition projections had a direct impact on its general funds. Assuming that EPIC's acquisition goal for the first six months of 1985 was $240 million, that should have meant a total influx to the general funds of $59,520,000.00 (based on a 6.8 percent builder fee and an 18 percent RDC). The $88 million shortfall in January through June 1985 meant a loss of almost $16 million to EPIC's general funds.

407. A few days earlier, Bob Kemp had noted that EPIC would need to acquire $175 million of properties in June 1985 in order to meet the six-month $300 million goal. Mr. Kemp concluded this memorandum regarding 1985 acquisitions with this ominous statement, "[i]f realistically it's not going to happen we need to come to grips with it and similarly prepare for whatever will practically come." *Memorandum from Bob Kemp to Ron Frazier*, dated March 26, 1985. The actual acquisitions in June 1985 were less than $33 million. EPIC defaulted a scant five weeks later.

408. In spite of existing financial difficulties, EMI and Community represented consistently that the EPIC companies were in good financial condition. Winner was informed by EPIC Mortgage, Inc. officials that there had never been a default on EPIC product loans and that there had never been a claim made on any private mortgage insurance certificate. Winner was never informed that EPIC absorbed any losses.

409. Anchor did not know that EPIC as general partner was taking the funds coming into the limited partnership and using them for general corporate purposes or for other limited partnerships that Anchor was not involved in. EPIC did not disclose to Anchor that it was in bad financial straits when it closed the deal.

410. At the closing of one of the mortgage purchases from EPIC Mortgage, Inc., Winner, of PSFS, asked about advances to the limited partnerships, and was told by an EPIC attorney that all advances were only temporary in nature.

411. Winner relied on oral representations of Bossle, Kemp, and others at EMI, that the borrowings by the partnerships were only temporary and limited in nature even though Kemp understood that EPIC would start making advances near the end of the life of the partnership.

412. Klotzbach and Berner of Empire of America, another employee of Empire, visited EPIC in 1985. After listening to EPIC's "corporate pitch" and the answers to their questions, Klotzbach and Berner were left with the impression that "there were absolutely no problems on any of their EPIC transactions. And everything appeared to be on very solid ground."

413. In the July 11, 1984 memo prepared to be submitted to Drexel Burnham in connection with the issuance of senior subordinated debentures by Community, EPIC presented itself to the world as a growing business with acquisition volume of $28,420,488 in 1977 to $500,000,000 by 1985. It presented EMI as a full service mortgage banker with a loan portfolio of over $1,000,000,000 and less than 1% in delinquencies. EMI projected $855,000,000 in loan originations in FY '84 with fees ranging from 1% to 2%. EPIC stated that at the time, virtually all loans were being sold within 90 days of origination.

414. In the July 11, 1984 memo, EPIC stated that Community's capitalization and financial condition was "sound." EPIC stated that Community had a high degree of liquidity. EPIC also stated that its "balance sheet does not reflect a 25% residual interest in 15,000 single-family homes conservatively valued at $10–15 million."

415. McCuistion on behalf of Community, sent a letter to Mr. William LeCompt, of the Maryland Division of Savings & Loans Associations, on February 1, 1983, representing, in part, that "All in all, ours is a very profitable activity and advances, when they are made, have little risk of not being returned—with interest."

416. After August 1983, Kemp told MGIC that EPIC was doing great and meeting all of its goals.

417. Ultimately, the financial condition of the EPIC partnerships was dependent on Community Savings and Loan. Without the presence of Community as an additional source of advances, the partnerships could not survive. In the spring and early summer of 1985 Community was under increasing financial pressure.

418. One reason that Community was acquired by EPIC was to "eliminate cash concerns as a daily operational problem." *Memo from TJB to CCM, et al.,* dated November 23, 1982.

419. In late 1982, Community was purchased by EPIC Acquistions, Inc., a corporation owned by the owners of EPIC and EMI. As a result of this purchase and a subsequent reorganization in early 1983, EMI became the wholly owned subsidiary of Community Financial Services, Inc. ("CFSI"), which was the wholly owned service subsidiary of Community. CFSI is not a party to this suit. Community itself became a subsidiary of EPIC Holdings, Ltd.

420. Community was thus used as a source of borrowings for EPIC. Community lent money to EPIC and EPIC lent that money to the partnerships. In 1984 and

1985, EPIC borrowed funds from Community for the purpose of making advances to the limited partnerships.

421. Community's advances to EPIC and the EPIC partnerships were massive. The Bank Board Report of May 24, 1985 identified $26,379,657.00 in advances directly to the limited partnerships, and $40,894,009.00 in advances to EPIC.

422. These advances, for which the cash requirements were always increasing, were necessary to keep the mortgage loans current.

423. There was no independent decision-making at Community about whether advances should be made to EPIC to fund the EPIC partnerships.

424. This is illustrated by the fact that there was insufficient equity in many of the EPIC properties to pay off the second trust loans placed on them by Community. Those second trust mortgages were substantially undersecured.

425. When Community made second trust loans to EPIC partnerships, it never appraised the real estate to see whether it justified a second mortgage.

426. EPIC used funds from Community to pay off existing partnership loans. EPIC obtained loans from Community, paid off existing investors and then used those documents to effectuate a sale to new investors.

427. Community controlled EMI's use of its warehouse lines of credit. When Community had substantial liquidity, it called EMI and requested that as much as possible be funded through Community. *Memorandum from Bob Kemp to Frank Bossle,* dated February 1, 1985.

428. Just as the EPIC companies were dependent upon Community for advances, Community was dependent upon the operation of the EPIC companies to generate its income. The Federal Home Loan Bank Board examiners found that Community's directors "have geared the operations of this institution on a fee income structured operation so that without the receipt of such fees, the association could not be sustained by normal operations from interest on its investments." In other words, Community was "largely dependent on income generated by its service corporations structure," including EPIC.

429. The policy regarding loan origination points changed frequently. For example, in September and October 1983, EMI retained four points on all EPIC Product settlements. In November of that year, points were remitted to Community to cover Community's costs incurred in selling loans to third parties. Following that month, however, all points were once again retained by EMI but the estimated expenses incurred by and owing to Community were accrued and then some payment was made to Community. In March 1984, the policy changed again, with one point being earned by EMI and three points being paid to Community. *Memorandum from Nancy Allen to Bob Kemp,* dated May 3, 1984.

430. The purpose of the 1983 changes was to "achieve the financial statement requirements imposed by HUD as well as increased earnings to EPIC Mortgage during this period of time." *Memorandum from Meltz to Kemp,* dated September 13, 1983.

431. Nancy Allen, the controller of EMI, discussed the inconsistency of the treatment of fees with Larry Mathias and "was advised that decisions regarding treatment of fees are made by Mr. Billman." *Memorandum from Nancy Allen to Bob Kemp,* dated April 3, 1984.

432. The EPIC partnerships depended in part on advances from Community to fund their negative cash flow. Neither United Guaranty nor Foremost nor Dominion knew this. The effect of the savings and loan crisis, however, was to eliminate Community as a source of funds. This was not disclosed.

433. The Bank Board examiners found that Community and the holding company organizations of which it was a part (including the EPIC companies) would become insolvent "unless massive outside recapitalization occur[ed]". While the Bank Board reports did not comment on the amount of

outside capitalization Community and the EPIC companies would require, they did find that Community would require a net worth infusion of over $105 million in order to qualify for Federal insurance.

434. Actions by highly ranked Community and EPIC officers in this time period reveal a total lack of confidence in Community's prospects. At the April 25, 1985 meeting of the Executive Committee of the Board of Directors of Community Savings and Loan, the Committee members recognized the effects of the beginning Maryland savings and loan crisis. While Mr. Billman stressed that the accounts of senior management should be maintained at Community to avoid causing unnecessary concern, the committee simultaneously directed Mike Shomper to "prepare a contingency plan" to allow for the rapid withdrawal of these accounts. Despite these instructions, one member of the Executive Committee withdrew $201,000.00 from her personal account on the very day of this meeting.

435. Seventeen days later, the Community Board of Directors Executive Committee authorized each member to "do with their deposits as each [member of senior management] sees fit."

436. As of May 10, 1985, the Executive Committee of Community Board of Directors recognized that if Community were shut down that EPIC would no longer be able to acquire homes or sell EPIC paper.

437. Only fourteen days after Community's Board decided to generate liquidity by accelerating acquisitions, the financial condition of Community had deteriorated to the point where the Community Board of Directors resolved to request that the State of Maryland appoint a temporary conservator for Community, and that it limit withdrawals by customers to $2,000 per month. This was done notwithstanding Community's own earlier recognition of the consequences of a conservatorship.

438. Community's financial condition was known to EMI's officers and directors. Robert N. Kemp, Jr., the president of EMI, also served as a director of Community Savings and Loan, Inc. and was involved in the deliberations of the Community Board relating to the imposition of a conservatorship upon Community.

439. A request for a conservator would have terminated Community's ability to make advances to EPIC.

440. On May 15, 1985, the Community Board of Directors withdrew its resolution authorizing the filing of a request for a conservatorship due to Governor Hughes' decision to limit withdrawals from Maryland-insured institutions.

441. None of these internal deliberations were disclosed to United Guaranty or to Foremost.

442. Neither United Guaranty nor Foremost was privy to these internal documents detailing the catastrophic effect on EPIC's business if Community's financial travails continued. It had never been represented to the PMI's that Community was an essential player in the EPIC story.

443. In April 1984, Tom Lindahl of EPIC did a study that indicated that EPIC needed approximately $100 million worth of equity to stay afloat (as of December 1983, the partnerships in existence needed an additional $183 million in cash to keep them going through 1987). Despite this identified need for capital, Community paid out over $15 million in dividends to its shareholders, all members of EPIC's senior management, in 1984 and 1985.

444. In May or June of 1984, Mr. Moorstein prepared a report that he called the Sales/Inventory Ratio. The report indicated that EPIC was acquiring approximately four properties for every one that it sold. This indicated to Mr. Moorstein that EPIC was really a pyramid and that it had no long range viability. Mr. Moorstein distributed his report to Ron Frazier, Tom Billman, Lenny Meltz and Clay McCuistion. Shortly after the dissemination of this report, Mr. Moorstein was fired.

445. Before being fired, Mr. Moorstein expressed his concerns about EPIC's viability to Tom Billman. He told Mr. Billman that he was concerned that EPIC needed a massive infusion of equity to stay afloat. Mr. Billman's response was to say, "look

... you understand how the EPIC system works and I understand how the EPIC systems works. But there is no point in alarming or bringing this kind of discussion up for other people. So if you have a question about this keep it to yourself and come and talk to me". Mr. Billman refused to testify about these issues, citing· the Fifth Amendment privilege against self-incrimination.

446. Mr. Billman stated to Mr. Moorstein that he intended to use EPIC's ancillary corporations as "lifeboats".

447. Just months before the EPIC default, Mr. Billman indeed cashed out his interest in the EPIC companies involved in partnership operations for $14 million in cash and control of eighteen EPIC-related entities.

448. The May 24, 1985 examination of Epicenter Consolidated, Limited, EPIC's parent company found that the reorganization of the EPIC companies in February 1985 had left the entire holding company structure "critically undercapitalized." As a result of the reorganization, Epicenter had gone from a positive net worth of over $40 million on December 31, 1984 to a negative net worth on April 30, 1985 of $13,009,204.00.

449. The EPIC Private Placement Offering Memorandum ("PPOM") was directed to limited partnership investors. It is a lengthy document filled with statements of risk factors associated with the EPIC partnerships.

450. At the time United Guaranty and Foremost agreed to insure EPIC loans, no PPOM dealing with those loans was in existence. The PPOM dealing with those loans would be prepared subsequently. Thus, United Guaranty and Foremost could only review a PPOM for an already existing partnership. They did so.

451. There is no disclosure anywhere in the private placement offering memorandum of the EPIC practice of sweeping the accounts of the partnerships each day and sending those funds to EPIC's general funds. Nor is there any disclosure that EPIC had failed to sell homes for a three-to-four year period.

452. Nor does this document provide any clear indication of the transfers of funds from individual partnership accounts to EPIC. Mr. O'Grady, plaintiffs' accounting expert, testified that as a trained accountant, he did not perceive in Schedule D that it indicated borrowings from the partnerships. In fact, Schedule D can be interpreted to show that the partnership should have enough funds to carry itself for well over a year. Schedule D of the offering memoranda does not put a reader on notice of the advances between the partnerships.

453. There is no disclosure in the PPOM that EPIC's ability to make advances to its partnerships was conditioned on acquisitions of properties and the availability of Community as a source of funds.

454. The PPOM disclosure stating that the general partner "may" borrow funds is inadequate. In reality, whatever funds were available to the partnerships were immediately wired to EPIC for EPIC's use. The PPOM should have said that the funds *would be* borrowed. Even as this disclosure is worded, however, it implies some restraint by EPIC. It states that borrowings are most likely to take place "while such funds are not immediately required by the partnership for its operations or debt service."

455. The PPOM states that builder rebates were paid to the partnership. The RDC was never paid to the partnership. These funds went directly to EPIC.

456. The statements in the PPOM are consistent with the representations made to United Guaranty and Foremost about the EPIC Program.

457. The offering memorandum states that the rental deficit contribution and the limited partner capital contributions will be used to pay the expenses of the partnership. The definition of "Builder Rebate" states that it "[has] been and will be applied by the partnership to partially fund initial operating deficits." The PPOM clearly states that limited partner contributions "will be used primarily to fund operating deficits of the partnership." And under "Anticipated Sources and Uses of

Proceeds," the PPOM states that $1,220,- 534.00 is "[a]vailable for cash flow deficits." The document in fact states that existing operating deficits "have been funded by the builder rebates paid to the partnership."

458. The PPOM is also consistent with EPIC's statement that the RDC would be escrowed. The PPOM states that "[t]he proceeds of this offering will be received and held in trust for the benefit of investors...." The offering memorandum also states that limited partner contributions "would be used primarily to fund the operating deficits of the partnership."

459. The offering memorandum states that the builder rebates are "directed to the partnership", and they were *paid to the partnership* or were paid "directly to the partnership." Rent on the homes was also "paid to the partnership."

460. With respect to the escrow issue, the PPOM specifically states that:

[t]he proceeds of this offering *will be received and will be retained in trust after closing* to be used only for the purpose set forth under "anticipated sources and uses of proceeds" or as otherwise set forth elsewhere in this memorandum.

461. Furthermore, the PPOM expressly recognizes that:

[a] general partner in a limited partnership is generally accountable to the limited partners as a fiduciary, which means that *a general partner in a limited partnership is required to exercise good faith and fair dealing in handling partnership affairs.*

462. The private placement memoranda do not disclose information that placed Foremost or United Guaranty on notice of the events that led to the EPIC default. Foremost and United Guaranty were told that the EPIC partnerships stood alone, separate and apart from each other. The private placement memoranda disclosed that the general partner was beset by conflicts of interest respecting the time it might devote to the affairs of one partnership as opposed to another, but they said that the general partner would work as a fiduciary with respect to monies entrusted to it by or on behalf of the partnership. Nothing in the partnership documents could have been understood to say that one partnership was in effect free to use the funds of another partnership.

463. The issuance of mortgage insurance is not a representation about the quality of the insured loan. Mortgage insurance underwriting is sometimes described as "review underwriting." This means that the mortgage insurer does not underwrite a loan, it merely reviews the underwriting which has already taken place at the originating lender.

464. Underwriters for private mortgage insurance companies thus rely upon the originating lender for the accuracy and completeness of information submitted in connection with an insurance application. It is the originator who is at the scene of the loan and who has the best access to information about it.

465. All the information on which mortgage insurers base their insurance decision comes from the lending institution originating the loan. Mortgage insurers do not attempt to determine the accuracy of data submitted to them.

466. Neither United Guaranty nor Foremost ever contacts borrowers directly. This is the responsibility of the lender, who has the existing relationship with the borrower. It would be unethical for a mortgage insurer to contact or question a borrower.

467. Paragraph 21.1 of the United Guaranty master policy is a statement that United Guaranty relies totally on the information supplied by the insured in making its decision as to whether or not the loan should be insured. This provision was contained in the EMI master policy. It read as follows:

The Insured agrees that statements made and matters presented by it, the Borrower or any other party in the application for the policy and in the appraisal, the plans and specifications and other exhibits and documentation submitted therewith or at any time thereafter are

the Insured's representations, and that the Company has issued the Commitment and Certificate in reliance upon the correctness and completeness thereof.

468. Foremost's master policy also indicates that it's agreement to insure was made "in reliance upon the statements made in the application for insurance and attachments submitted by the insured."

469. Indeed, the practical operation of the mortgage insurance industry would not allow more complete underwriting because the typical turnaround time for a decision on whether mortgage insurance will be issued is approximately 24 hours. Time is critical in processing mortgage insurance commitments. Lenders in fact choose their mortgage insurers on how quickly they can process a loan. This one-day turnaround does not allow time for independent verification of the data submitted by the lender. It does not allow for much more than checking to see that papers are filled out correctly and the loans meet the agreed upon parameters. This is done by a low-level employee. It would take from one to two months to check upon every item of information contained in a loan package submission. If this were required, there would be no mortgage insurance as it exists today.

470. This secondary type of underwriting is reflected in the premium structure in the industry. Mortgage insurance involves a very low premium because lenders are not charged a premium for verification of the information they have submitted. The premium structure does not take into account the possibility that an insurance application will be inaccurate or incomplete. The mortgage insurance premium structure assumes that losses stemming from fraud will be denied. It makes no distinction between a loan held by the originator and loans sold on the secondary market. Thus, the review verification which takes place is done for the benefit of the mortgage insurer, not the lender.

471. It is well understood in the mortgage insurance industry that mortgage insurers rely upon both written and oral representations in making their underwriting decision.

472. FNB also relied upon verbal representations of EPIC as to how their partnership program worked. Mr. Wilcox of FNB believed that this conduct was reasonable. PSFS relied on oral representations as well.

473. The fact that a loan is purchased on the secondary market does not remove the purchaser's obligation to underwrite the loan.

474. If lenders purchasing loans on the secondary market want a mortgage insurer to underwrite those loans, they can pay for this service. An affiliate of United Guaranty called United Guaranty Services, Inc. performs a service known as "contract underwriting." In that situation, United Guaranty Services, Inc. will agree with the lender that it will review loans for a specified set of underwriting criteria. In that context, United Guaranty makes a warranty about its underwriting. There is a standard written contract executed in connection with that service. This service is not provided by United Guaranty Residential Insurance Company of Iowa. There was no such arrangement in the present case.

475. Also, if secondary market purchasers wish to be protected against the risk of fraud, there is a type of insurance coverage which is available. It is known as a fraud bond. Mortgage insurance does not protect against fraud.

476. Mortgage insurers are "monoline" companies. They are restricted in their underwriting to one specific line of insurance and thus, for example, cannot insure against fidelity risk. The policies of United Guaranty and Foremost have therefore always been that they do not pay in the event of fraud—even if the loan has been sold to another lender. The obligation to deny claims for fraud is a regulatory one.

477. It is understood throughout the industry that if the information the mortgage insurer receives is not accurate and complete that there is no coverage. Mortgage insurers not involved in this litigation, such as Verex and PMI, testified to this fact as well. This is true even if the loan is sold on the secondary market. Lenders as

well are aware that it is their obligation to supply complete and accurate facts.

478. EMI was well aware that its mortgage insurers retained the right to rescind coverage or deny claims if misrepresentations were made. In a memorandum regarding the new master policy of PMI, another mortgage insurer, an EPIC employee wrote, "[u]nder the master policy the MI has the right to deny claims for any misrepresentations (known or unknown)." *Memorandum from Stu Jaffe to Bob Kemp*, dated March 29, 1985.

479. In fact, one lender wrote to EMI concerning policy language which required savings institutions to assume liability for inaccuracies in loan applications. *Letter from Gordon Rogers to Stuart Jaffe*, dated January 1, 1985.

480. A secondary market purchaser has an obligation to determine what underwriting the originator is doing, even if there is mortgage insurance on the loan.

481. Private mortgage insurance is not sufficient to enable a purchaser of loans to disregard "the characteristics of the mortgages in the pool that bear on default and delinquency risks."

482. The non-EPIC defendants merely purchased loans in a commercial transaction. Parties acquiring EPIC product loans executed forward commitments to purchase such loans, and in return, received commitment fees from EMI.

483. In connection with closing pass-through pools, FNB maintained pool closing books and original documents related to the loan pool. Certificate holders did not receive appraisals, mortgage insurance certificates, or mortgage insurance master policies, except at their request. Certificate holders did not request such documents prior to default.

484. The transfer documents by which EMI conveyed certificates of participation in a pool of whole mortgage loans included a warranty by EMI that a valid mortgage insurance policy had been issued for each mortgage loan assigned and was in full force and effect on the date of the assignment. The transfer documents provided that if this warranty was breached, EMI was obligated within 60 days of notification of the breach to cure the breach or to repurchase the mortgage loan assigned.

485. Loan purchasers acquired EPIC loans for their high yield, based on their previous experience with EPIC loans and in reliance on other purchasers or brokers. Defendants purchased EPIC product loans before they knew that Foremost and United Guaranty, Inc. would insure those loans and, in fact, before plaintiffs had committed to insuring EPIC Product loans.

486. Foremost made no misrepresentations or omissions to defendants or in its advertisements. In fact, Foremost had no contact with the defendants. Furthermore, defendants did not review or rely on Foremost advertisements or other documents in purchasing EPIC Product loans.

487. The pass-through certificates purchased by defendants are not securities under the Federal Securities Acts and regulations.

488. There existed no expectation of profit from the entrepreneurial or managerial efforts of EMI or FNB. On each sale of loans, the certificateholders were entitled to a predetermined rate of interest. EMI merely sold the loans to the certificateholders, retaining the servicing rights on the loans, and receiving a fee for those services. FNB's role as trustee was to be the repository of documentation and to take over the servicing if it was not performed properly. FNB has no entrepreneurial or managerial responsibilities.

489. Foremost did not intend to deceive, manipulate or defraud defendants. Foremost would not have insured EPIC product loans if it had known the true nature of EPIC's program.

490. Defendants did not rely on Foremost concerning their purchase of EPIC loans, nor were any damages they may have suffered caused by Foremost. Defendants committed to purchase EPIC product loans before EMI obtained insurance from Foremost on the loans. In fact, at the time that they committed to purchase EPIC product loans, some investors

either did not know that Foremost might insure EPIC product loans or did not want Foremost to insure their loans.

## CONCLUSIONS OF LAW

As set out in the findings of facts, EPIC Mortgage had several meetings with the plaintiffs about insuring EPIC loans prior to the issuance of master policies. During those meetings EPIC Mortgage described EPIC as a successful, growing company with a unique business plan. It did not reveal that EPIC was experiencing serious problems with key aspects of its plan.

It was represented that EPIC formed limited partnerships in which it served as general partner. Individual investors were the limited partners. The partnerships acquired single family residences from builders. EPIC Mortgage made mortgage loans to the partnerships. The proceeds of the loans were used to purchase the properties. The properties were rented.

Each partnership was formed and operated separately. Each partnership stood on its own. Each one acquired a relatively small number of homes. The aggregate value of each partnership's assets was in the range of $4 to $5 million. A loss sustained by one partnership would not affect the other partnerships.

Initially, each partnership had funds available to it from the following sources: (i) limited partner investments, (ii) income available from rental of the properties (for properties that were not rented at the time they were acquired, the builders paid 6 months rent in advance), and (iii) rental deficit contributions.

These funds were paid to and held by the partnerships. The funds for each partnership were held separately for the benefit of the partnership. In the case of the rental deficit contributions, they were held in escrow for the benefit of their partnerships. Funds available from these sources—limited partner investments, rentals and rental deficit contributions—were sufficient to make the payments due on the loans for approximately five years. At the end of the fourth or fifth year, EPIC would sell the properties. The proceeds from the sales would be used to pay off the loans and profits were distributed to the partners.

Representations or omissions about these issues were made on several occasions. Before insuring EPIC loans, the insurers visited EPIC's offices and reviewed written materials about the EPIC Program, including financial statements, a private placement memorandum, certain explanatory promotional materials, and other documents.

Each of the representations or omissions listed above was material to the decision to insure the EPIC loans. The insurers believed each of those facts to be true. If they had known that any of them were not true, then they would not have agreed to insure or to continue insuring EPIC loans.

Moreover, a reasonable insurer under the same circumstances would not have agreed to insure the EPIC loans if it had known that any such facts were not true. Reliance on such representations was reasonable under the circumstances and in keeping with the standards and practices of the mortgage insurance industry.

The loans and insurance that are the subject of this action were originated in May, June and July 1985. All of the EPIC loans went into default in early August 1985. For most of the loans at issue in this action the borrowers never made the first monthly payments that came due. If the representations made to United Guaranty by EPIC Mortgage had been true, that could not have happened.

EPIC Mortgage had represented that each of the EPIC partnerships stood alone. It said that each was separate and independent from the rest. It said that the funds of each partnership were held for the benefit of that partnership. In particular, EPIC Mortgage represented that rental deficit contributions were held in escrow to pay mortgage obligations. EPIC Mortgage made these same representations to many others.

In addition, EPIC represented as the general partner of the partnerships, that it

would administer the affairs of the partnerships as a fiduciary.

A brief statement in a very long private placement offering memorandum disclosed to partnership investors that surplus funds of partnerships might be borrowed by EPIC in certain defined circumstances. There is no suggestion that any such borrowings would not be handled consistently with EPIC's fiduciary duty. There is no disclosure anywhere that in fact the new partnerships were formed and new partnership loans were generated because EPIC needed new money to pay debts of the old partnerships.

Contrary to its representations, EPIC's actual practice in 1985 was to sweep all funds out of partnerships—*automatically*—as soon as any money was received. There were no separate accounts. Instead, there was one massive account in which funds of all of the EPIC partnerships were commingled. EPIC took everyone's money and used it for EPIC's purposes—which were to prop up the old partnerships at the expense of the new ones.

This was not "borrowing." It was not using funds for the benefit of the partnerships which owned them. It was not consistent with EPIC's fiduciary duty. And it was contrary to what EPIC Mortgage had represented.

A necessary part of the EPIC "concept", as EPIC Mortgage explained it, was that at an appropriate time the properties owned by the partnerships would be sold and the proceeds used to pay off the mortgages. If EPIC were unable to sell the properties for enough money to pay off the loans and return the limited partners' investments, then the "concept" would be invalid and EPIC could not continue in business.

EPIC Mortgage described the program to the plaintiffs in terms that led them to believe that the "concept" was working and that EPIC was experiencing no problems selling the properties owned by the older partnerships.

By early 1985, however, EPIC was experiencing significant problems selling the properties. An internal study had showed that for 80 of the older partnerships, the values of the partnership properties were not sufficient to return invested capital to the limited partners. Between 1981 and 1984, EPIC sold only 55 properties in arms length sales. During that same period hundreds of properties were available from partnerships that were in the fifth year of their existence.

EPIC could not admit this failure in its concept. If it became known that the properties would not sell, EPIC would not be able to attract new investors, lenders, or insurers. Accordingly, EPIC decided to prop up the old partnerships, and prevent them from defaulting. It did this by taking money that belonged to the new partnerships.

EPIC finally disposed of the unsold properties by arranging to "sell" them to new EPIC partnerships which "bought" the properties at prices dictated by EPIC which were high enough to "validate the concept." Andrea Barthello described these arranged sales as simply postponing a problem until five years later—when it would be worse.

■ Since this action was initially brought in the United States District Court for the Middle District of North Carolina, this court should apply the law of that forum to United Guaranty's affirmative claims of fraud and misrepresentation. *See, e.g., In re Agent Orange Product Liability Litigation,* 580 F.Supp. 690, 695 (E.D.N.Y.1984); *In re Air Crash Disaster,* 399 F.Supp. 1106, 1108 (D.Mass.1975). This includes North Carolina's choice of law rules, which apply the law of the place of plaintiff's injury to claims sounding in tort. *See e.g., Andrew Jackson Sales v. Bi–Lo Stores, Inc.,* 68 N.C.App. 222, 224, 314 S.E.2d 797, 799 (1984); *La Grenade v. Gordon,* 60 N.C.App. 650, 654, 299 S.E.2d 809, 812 (1983). United Guaranty's principal place of business is located in North Carolina. The decision to insure the EPIC loans was made there, and the injury occurred there. The law of Virginia applies to the Foremost claims of fraud and misrepresentation.

■ The choice of law makes little difference as the law of both Virginia and North Carolina requires that these plaintiffs be allowed to rescind because of misrepresentation and fraud. Also, the applicable insurance statutes in North Carolina and Virginia provide for the right to rescind if a material misstatement is made. N.C.Gen.Stat. Sec. 58–30, Virginia Code Sec. 38.1–336.

Under North Carolina law, a fact is material:

> if the knowledge or ignorance of it would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of premium.

*Fishblate v. Fidelity Co.*, 140 N.C. 589, 593, 53 S.E. 354, 356 (1906) (quoting 16 Am. & Eng. Inc. (2 Ed.) 933). *Accord Jeffress v. New York Life Insurance Co.*, 74 F.2d 874, 877 (4th Cir.1935); *Tedder v. Union Fidelity Life Insurance Co.*, 436 F.Supp. 847, 849 (E.D.N.C.1977); *Tolbert v. Mutual Benefit Life Insurance Co.*, 236 N.C. 416, 418–19, 72 S.E.2d 915, 917 (1952). The insurer need only "show that the representations were material and that they were untrue." *Tolbert*, 236 N.C. at 419, 72 S.E.2d at 917.

Similarly, under Virginia law, a representation is material if it would naturally and reasonably have influenced the insurance company with respect to the contract or the risk. *Inter–Ocean Insurance Co. v. Harkrader*, 193 Va. 96, 67 S.E.2d 894, 897 (1951); *Fidelity Bankers Life Insurance Corp. v. Wheeler*, 203 Va. 434, 125 S.E.2d 151, 153–54 (1962).

In this case, the evidence is clear that United Guaranty and Foremost would not have insured the EPIC risk if the true facts had been presented to it. The same would be true of reasonable insurers generally.

■ The North Carolina Supreme Court dealt with this issue in *Bryant v. Nationwide Mutual Fire Insurance Co.*, 313 N.C. 362, 329 S.E.2d 333 (1985). The court approved the following jury instruction dealing with the issue of an insurer's reliance:

> It is not necessary for the insurer ... to be actually deceived, prejudiced or injured by the false or fraudulent statements made by the insured in order to void the policy of insurance. Therefore *you need not be persuaded that Nationwide relied or acted upon the statements of the insured to its detriment, it being sufficient to void the policy that the plaintiffs made material representations knowing them to be false.*

*Id.* at 371, 329 S.E.2d at 339 (emphasis added). All that United Guaranty must establish is that EMI and EPIC made material misrepresentations to it.

■ Other cases stand for this proposition as well. North Carolina and Virginia cases are clear that materiality is a question of law. *Tedder v. Union Fidelity Life Insurance Co.*, 436 F.Supp. 847, 849 (E.D. N.C.1977); *Gilmore v. Prudential Insurance Co. of America*, 432 F.Supp. 35, 37 (W.D.Va.1977); *Chitwood v. Prudential Insurance Co. of America*, 206 Va. 314, 143 S.E.2d 915, 918 (1965); *Old Republic Life Insurance Co. v. Bales*, 213 Va. 771, 195 S.E.2d 854, 856 (1973). Misrepresentations were made about the administration of the limited partnerships and the financial condition of the EPIC enterprise. The uncontradicted testimony was that if the insurers had known the truth about the EPIC Program, it would not have insured the loans. Dr. Plotkin confirmed this fact with expert testimony. The misstatements were therefore material.

■ Under the North Carolina rescission statutes, the insurer need not show that the insured made the misrepresentation knowingly. *See e.g., Cary Family Medicine v. Prudential Insurance Co.*, 88 N.C. App. 760, 364 S.E.2d 737 (1988). *Rhinehardt v. North Carolina Mutual Life Insurance Co.*, 254 N.C. 671, 673, 119 S.E.2d 614, 616 (1961); *Hicks v. Home Security Life Insurance Co.*, 226 N.C. 614, 618, 39 S.E.2d 914, 917 (1946).

Thus, the insurer need not prove that the false representations were made with any fraudulent purpose (i.e., intent to deceive) in order to rescind the insurance policy under the North Carolina statute. *Tedder*

*v. Union Fidelity Life Insurance Co.,* 436 F.Supp. 847, 849 (E.D.N.C.1977); *Tolbert v. Mutual Benefit Life Insurance Co.,* 236 N.C. 416, 418, 72 S.E.2d 915, 917 (1952).

Under Virginia law, the rule is the same. It is not necessary for an insurer to prove that a misrepresentation was fraudulent in order to avoid liability under an insurance policy. *Gilmore v. Prudential Insurance Co. of America,* 432 F.Supp. 35, 37 (W.D. Va.1977); *Old Republic Life Insurance Co. v. Bales,* 213 Va. 771, 195 S.E.2d 854, 856 (1973); *Chitwood v. Prudential Insurance Co. of America,* 206 Va. 314, 143 S.E.2d 915, 919 (1965). Even if a misrepresentation is innocent, no recovery is permitted as long as the misrepresentation was material. *Scott v. State Farm Mutual Automobile Insurance Co.,* 202 Va. 579, 118 S.E.2d 519, 522 (1961); *Mutual Benefit Health & Accident Association v. Alley,* 167 Va. 144, 187 S.E. 456 (1936).

■ The law of both Virginia and North Carolina is similar on the fraud issue. Under North Carolina law, a plaintiff mush show that the defendant:

> made a representation relating to some material past or existing fact, that the representation was false, that defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion, that defendant made the representation with the intention that it should be acted upon by the plaintiff, that the plaintiff reasonably relied upon the misrepresentation and acted upon it, and that the plaintiff suffered injury.

*Webb v. Triad Appraisal and Adjustment Service, Inc.,* 84 N.C.App. 446, 448, 352 S.E.2d 859, 861–62 (1987); *accord Johnson v. Phoenix Mutual Life Insurance Co.,* 300 N.C. 247, 253, 266 S.E.2d 610, 615 (1980). Also, a party can be liable in fraud for omissions where that party has taken affirmative steps to conceal material facts from the other party to the transaction. *See e.g., Harton v. Harton,* 81 N.C.App. 295, 298, 344 S.E.2d 117, 119, *cert. denied,* 317 N.C. 703, 347 S.E.2d 41 (1986); *Ragsdale v. Kennedy,* 286 N.C. 130, 139–40, 209 S.E.2d 494, 501 (1974).

■ The law of Virginia is similar, with one significant exception. *See e.g., Jefferson Standard Life Insurance Co. v. Hedrick,* 181 Va. 824, 27 S.E.2d 198, 202 (1943); *McDaniel v. Hodges,* 176 Va. 519, 11 S.E.2d 623, 625 (1940). Virginia law does not require proof of an intent to deceive in order to establish fraud. *McDaniel, supra.* Liability also exists for omissions under Virginia law, if the speaker is in possession of information which would render a previous representation incorrect. *Ware v. Scott,* 220 Va. 317, 257 S.E.2d 855, 858 (1979).

■ EPIC and EMI representatives deceived United Guaranty and Foremost as to the operation and funding of the partnerships and the financial condition of their companies. They omitted material details about these matters. At the time, those in control of EPIC knew these representations to be false, and that a fuller disclosure was necessary to correct the misrepresentations that had been made. They caused misrepresentations to be made in order to lure the mortgage insurers into their scheme, and they were injured as a result.

■ The only issue which defendants seek to question is whether reliance upon EPIC's representations was reasonable. The evidence demonstrated that the mortgage insurers review of the transaction was reasonable and met the standards and practices of the industry. The nature of mortgage insurance is such that insurers properly rely on insured parties to supply accurate and complete information about insurance transactions. Otherwise, insurance could not be provided at a feasible cost or within practical time limits. In this case, the plaintiffs properly abided by the normal practice in its industry. United Guaranty and Foremost have established fraud on the part of EMI and EPIC.

■ Defendants' argument that the mortgage insurers should have discovered the problems that later surfaced at EPIC ignores the law, which required EMI to make full disclosure. An insured has a duty to disclose the nature of the risk being insured to its insurer completely and

accurately. *Apolskis v. Concord Life Insurance Co.*, 445 F.2d 31, 35 (7th Cir.1971) (applying Illinois law) (citations omitted); *accord Crawford v. Manhattan Life Insurance Co.*, 208 Pa.Super. 150, 221 A.2d 877, 886 (1966) (applying Virginia law) (insurers "had every right to rely on answers given" in insurance application); *Fireman's Fund Insurance Co. v. Knutsen*, 132 Vt. 383, 324 A.2d 223, 229 (1974) (in general, "one has no duty to investigate another's representation, but may rely on its truth"); *State Farm Mutual Auto Insurance Co. v. Price.*, 181 Ind.App. 258, 396 N.E.2d 134, 137 (1979) (insurer was "entitled to rely" on facts given in insurance application and "had no duty to investigate the truthfulness of the application"); *Braaten v. Minnesota Mutual Life Insurance Co.*, 302 N.W.2d 48 (S.D.1981); *Omaha National Bank v. Manufacturers Life Insurance Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983) (citing *Knutsen* and *Apolskis*).

■ Under Virginia law, the insured must speak fully and truthfully to its insurer. As the Supreme Court of Virginia held in *Inter–Ocean Insurance Co. v. Harkrader*, 193 Va. 96, 67 S.E.2d 894, 897 (1951):

> Representations in an application for a policy of insurance should not only be true but full. The insurer has the right to know the whole truth. If a true disclosure is made, it is put on guard to make its own inquiries, and determine whether or not the risk should be assumed. A misstatement of material facts by the applicant takes away its opportunity to estimate the risk under its contract.

*Accord Fidelity Bankers Life Insurance Co. v. Wheeler*, 203 Va. 434, 125 S.E.2d 151, 153 (1962); *Hawkeye–Security Insurance Co. v. Government Employees Insurance Co.*, 207 Va. 944, 154 S.E.2d 173, 176 (1967); *Mutual of Omaha Insurance Co. v. Dingus.*, 219 Va. 706, 250 S.E.2d 352, 355 (1979).

Under North Carolina law, the insured has the same duty. An insured's obligation is to "communicate all facts within [its] knowledge which [might] affect the risk" before entering into the master policy. *Whitley v. Peidmont & Arlington Life Insurance Co.*, 71 N.C. 480, 483–84 (1874). *Accord Schas v. Equitable Life Insurance Co.*, 166 N.C. 55, 60, 81 S.E. 1014, 1015 (1914).

One court has dealt extensively with the issue of the nature of the mortgage insurance industry and the insurer's right to rely upon the information provided as being true and correct. In *CenTrust Mortgage Corp. v. PMI Mortgage Insurance Co.* No. C551517 (Super.Ct.Ariz. Dec. 10, 1987), PMI had insured 63 loans originated by plaintiff CenTrust. The court found that the lender had not communicated the key terms of the transaction to PMI and had affirmatively misrepresented certain terms of the transaction. In holding that the mortgage insurer had the right to rescind its coverage, the court made the following findings of fact with respect to the mortgage insurance business.

a. The mortgage lending and mortgage insurance business is built upon a relationship of trust.

b. Mortgage insurers have a right to expect, and do expect, that mortgage lenders will fully and fairly disclose material terms of transactions, particularly where the transaction is an unusual or unique one.

c. Mortgage lenders are able to gather many more facts from many more sources than mortgage insurance companies.

d. Mortgage lenders expect mortgage insurers to conduct "review underwriting" in which they review the underwriting documents provided by the lenders, and to provide prompt responses to underwriting requests, usually within 24 hours.

e. It is not unusual or [im]prudent for a mortgage insurer to rely upon information provided to it by a mortgage lender during the project approval process.

*CenTrust* at 2–3. *Accord Verex Assurance, Inc. v. John Hanson Savings and Loan*, 816 F.2d 1296, 1305 (9th Cir.1987) ("an insurer may rely upon representations by an applicant for insurance, even if the

insurer was negligent in failing to investigate the insured.").

The plaintiffs were entitled to expect, and reasonably did expect, a full disclosure from EMI.

■ In the absence of any "danger signals," an insurer has no duty to investigate representations made to it by its insured and is entitled to rely upon the truth and accuracy of those representations. *See e.g., Garcia v. Aetna Casualty and Surety Co.,* 657 F.2d 652, 656 n. 2 (5th Cir.1981) ("[T]he insurer has a right to rely upon the applicant's representations and is under no duty to inquire further."); *Rutherford v. John Hancock Mutual Life Insurance Co.,* 562 F.2d 290, 293–94 (4th Cir.1977); *Apolskis v. Concord Life Insurance Co.,* 445 F.2d 31, 36 (7th Cir.1971) ("An insurance company need not make any independent investigation and may rely on the truthfulness of answers contained in an insurance application at least if there is nothing to put it on notice that certain answers may be false."); *Omaha National Bank v. Manufacturers Life Insurance Co.,* 213 Neb. 873, 332 N.W.2d 196 (1983) ("[e]very contracting party has an absolute right to rely on the express statement of an existing fact...."). Everything EMI did and said was designed to, and in fact did, present the appearance of a program which had worked for years without a problem. There was nothing in EMI's representations, explanations, or history to put the insurers guard.

Indeed, the purchasers of mortgage insurance require a turnaround time that is too quick to allow for more than review underwriting. Testimony also established that mortgage insurance premiums would be much higher if mortgage insurers insured against fraud.

■ In the absence of some factor which should have caused the mortgage insurers to doubt that EMI was telling the truth, they were entitled to assume that what EMI said in its oral presentations was true. *Johnson v. Lockman,* 41 N.C.App. 54, 59, 254 S.E.2d 187, 190 (1979) (quoting *Roberson v. Williams,* 240 N.C. 696, 702, 83 S.E.2d 811, 815 (1954)), *cert. denied,* 297

N.C. 610, 257 S.E.2d 436 (1979). *Accord Northwestern Bank v. Roseman,* 81 N.C. App. 228, 233–34, 344 S.E.2d 120, 124 (1986), *cert. denied,* 318 N.C. 284, 348 S.E.2d 139 (1986); *Johnson v. Owens,* 263 N.C. 754, 757–58, 140 S.E.2d 311, 314 (1965).

■ Where a party seeks rescission of a contract, lack of reliance can be a defense to rescission only in very egregious circumstances. For example, in *Marine Bank, National Ass'n v. Meat Counter, Inc.,* 635 F.Supp. 1029 (N.D.Ill.1986), *rev'd on other grounds,* 826 F.2d 1577 (7th Cir.1987), plaintiff argued that defendant's failure to read a contract before signing it barred his rescission, even in light of defendant's own uncontroverted misrepresentations about the substance of the contract. The court said

This argument misunderstands the narrow, modern definition of 'justifiable reliance'.... A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

635 F.Supp. at 1033 (quoting Restatement (Second) of Contracts Sec. 172). This rejection of the defense of unreasonableness in light of clear misrepresentations in the formation of a contract is the rule, not the exception. *See e.g., Woodling v. Garrett Corp.,* 813 F.2d 543, 553 (2d Cir.1987); *Barrer v. Women's National Bank,* 761 F.2d 752, 759 (D.C.Cir.1985); *Arlington Park Racetrack v. SRM Computers, Inc.,* 674 F.Supp. 986 (E.D.N.Y.1987); *First National Bank and Trust Co. v. Notte.* 97 Wis.2d 207, 293 N.W.2d 530 (1980) (all holding that reliance is unjustified only if "it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.").

■ There is no evidence that the plaintiffs could have discovered the fraud even if they had conducted the investigation defendants claim should have taken place. In fact, the failure of EPIC's own auditors,

Fox and Company, and the failure of Touche Ross' extensive audit on behalf of the large insurers to uncover the fraud indicates that even if United Guaranty had conducted an investigation, it would *not* have discovered the fraud.

An insurer cannot be charged with knowledge of facts that could not have been discovered through reasonable investigation. *See e.g., Parker Precision Products Co. v. Metropolitan Life Insurance Co.,* 407 F.2d 1070, 1075 (3rd Cir.1969); *Friedman v. Prudential Insurance Co. of America,* 589 F.Supp. 1017, 1024 (S.D.N.Y. 1984).

These holdings are in accord with the law of both Virginia and North Carolina. In *Johnson v. Owens,* 263 N.C. 754, 140 S.E. 2d 311 (1965), the North Carolina Supreme Court rejected the same argument made in *Morgan:*

> We think that a seller who has intentionally made a false representation about something material, in order to induce a sale of his property, should not be permitted to say in effect, 'You ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you..' Courts should be very loath to deny an actually defrauded plaintiff on this ground.

*Id.* at 758, 140 S.E.2d at 314. *Accord Keith v. Wilder,* 241 N.C. 672, 675, 86 S.E.2d 444, 447 (1955); *Carter v. Parsons,* 61 N.C.App. 412, 419–20, 301 S.E.2d 405, 410 (1983). Courts should not deny relief on the theory that if the victim had been more attentive, the fraud would not have worked. *Roberson v. Williams,* 240 N.C. 696, 703, 83 S.E.2d 811, 815 (1954).

Under Virginia law also, "the cases are clear that ... one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." *Nationwide Insurance Co. v. Patterson,* 229 Va. 627, 331 S.E.2d 490, 492 (1985).

The facts and expert testimony establish that in reviewing EPIC and agreeing to insure the loans, the mortgage insurers acted reasonably and met or exceeded the normal standards of the private mortgage insurance industry. They are entitled to rescind the insurance because EPIC Mortgage failed to provide them with complete, accurate, and truthful information.

■ The fact that EPIC Mortgage subsequently transferred most of the loans to its associate, Dominion Federal Savings and Loan Association, and others to its parent, Community Savings and Loan, does not change this result. Both Dominion and Community were intimately familiar with EPIC's affairs. In any event, as assignees both Dominion and Community "stand in the shoes" of EPIC.

■ Likewise, the certificateholders, as assignees, are subject to all claims and defenses that may be asserted against the assignor. *See e.g., Houk v. Commissioner of Internal Revenue,* 173 F.2d 821, 825 (5th Cir.1949); *National Bank & Trust Co. v. Castle,* 196 Va. 686, 85 S.E.2d 228 (1955); *Munchak Corp. v. Caldwell,* 25 N.C.App. 652, 654, 214 S.E.2d 194, 196 (1975), *cert. denied,* 287 N.C. 664, 216 S.E.2d 907 (1975).

■ The holder-in-due-course status which Dominion seeks exists only under the Uniform Commercial Code. The code does not address insurance contracts and is, therefore, inapplicable in this case.

■ An insurance contract is simply a contract. Insurance policies are, therefore, interpreted and enforced in accordance with the same rules that govern contracts. *See e.g., United States v. Campbell,* 139 F.2d 424, 426 (4th Cir.1943). The assignee of a contract of insurance "stands in the shoes" of the assignor. *Atlas Underwriters, Ltd. v. Meredith Burda, Inc.,* 231 Va. 255, 343 S.E.2d 65 (1986). *Accord National Bank & Trust Co. v. Castle,* 196 Va. 686, 85 S.E.2d 228, 232 (1955).

This rule applies even if the assignee is an innocent party without notice of the misrepresentation. *Shapiro v. American Home Assurance Co.,* 584 F.Supp. 1245, 1251–52 (D.Mass.1984); *See also Burruss v. National Life Association,* 96 Va. 543, 32 S.E. 49, 50 (1899); *Verex Assurance,*

*Inc. v. John Hanson Savings and Loan,* 816 F.2d 1296, 1304 (9th Cir.1987); *Centrust Mortgage Corp. v. PMI Mortgage Insurance Co.,* No. C55157 (Super.Ct.Ariz. Dec. 10, 1987). Accordingly, the fraud followed the loans insured by Foremost and United Guaranty. When the investors purchased the loans, they purchased the fraud as well.

The certificateholders have asserted estoppel and waiver as affirmative defenses to the rescission claims; however, they have not established the essential elements for either defense.

■ The burden is on the party asserting estoppel to establish the elements of estoppel through "clear, precise and unequivocal evidence". *Trayer v. Bristol Parking, Inc.,* 198 Va. 595, 604–05, 95 S.E. 2d 224, 232 (1956); *See also Tidewater Equipment Co. v. Reliance Insurance Co.,* 650 F.2d 503, 506 (4th Cir.1981). No evidence was produced at trial of any conduct that would warrant estopping the mortgage insurers from asserting their rights to rescind the insurance policies issued to EMI.

■ One asserting waiver as an affirmative defense in the context of an action to rescind an insurance policy must establish an intentional relinquishment of that right to rescind by the insurer. The evidence produced at trial established that the insurers acted promptly to preserve their right to rescind and that they did nothing which could be construed as an intentional relinquishment of that right.

Thus, because defendant financial institutions are assignees of EMI's rights in the policies issued to EMI and stand in EMI's shoes with respect to those rights, the policies may now be rescinded although in the hands of EMI's assignees.

United Guaranty and Foremost are thus entitled to rescind the insurance; however, Foremost has failed to prove any damages it claims to have suffered as a result of EMI's fraud.

Purchasers of the pass-through certificates in pools of mortgages originated by EMI and insured by Foremost have alleged that Foremost has committed both primary and aider and abettor violations of § 10(b) of the Securities Exchange Act of 1934 (Securities Act) and Rule 10b–5 thereunder.

■ The elements of a primary violation of § 10(b) are: (1) the purchase or sale of a security; (2) the use of a manipulative or deceptive device; (3) scienter, the intent to deceive or defraud; (4) reliance; and (5) causation. See 3 Fed.Sec.L.Rep. (CCH) ¶ 22, 781.026, p. 16, 635–13 (1986).

Not one of the elements of a § 10(b) cause of action exist in the case of the Securities Act claims asserted against Foremost by the purchasers of certificates of participation in pools of mortgages originated by EMI.

■ The certificates of participation sold by EMI in a pool of mortgage loans originated by EMI and insured by Foremost are not securities and the claims of the purchasers of these certificates are not cognizable under the Securities Act.

EMI sold the mortgage loans it originated and Foremost insured to sophisticated, federally regulated lending institutions. Some of these mortgage loans were sold as "whole loans"; some were sold as certificates of participation in pools of these mortgage loans.

■ For purposes of the Securities Act, the term "security" is defined to mean "any ... investment contract ... or any certificate of interest or participation in ... any of the foregoing." 15 U.S.C. § 77b(1). Though this definition is broad, it has never been applied literally. *Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1493 (8th Cir.1984). Instead, it has been limited in accordance with the Congressional intent to regulate only those "variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

■ The test for determining whether a particular transaction involves a security was defined by the Supreme Court in *Howey, id.* at 301, 66 S.Ct. at 1104, and reit-

erated in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). Under those decisions, an instrument is a "security" if it represents (1) an investment, (2) in a common venture, (3) with a reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others. *Union National Bank of Little Rock v. Farmers Bank, Hamburg, Arkansas,* 786 F.2d 881, 884 (8th Cir.1986) (citing *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104). If an instrument fails to meet *any one* of the four elements of this test, then that instrument is not a "security". *Burton v. Heinold Commodities, Inc.,* 646 F.Supp. 360, 361 (E.D.Va.1986).

EMI's sales of certificates of interest in pools of the mortgage loans EMI originated and Foremost insured do not meet any of the four elements of this test.

In determining whether an "investment" has been made, courts consider:

[T]he size of the offering; whether is, by necessity, reliance on the expertise of the issuer; the purpose of the issuer in executing the note and the payee in accepting the notes; and the economic inducements held out to the prospect[;] ... the degree to which the profit on the note is in the hands of the maker rather than the payee; whether the object of the holder was to acquire an interest in the property or enterprise; whether the note was primarily commercial because it was serving as a "cash substitute" for the purchase price; and whether the return on the note was predetermined or could reasonably be anticipated, or was subject to the managerial efforts of the maker.

*South Carolina National Bank v. Darmstadter,* 622 F.Supp. 226, 229–30 (D.S.C. 1985) quoting *Futura Development Corp. v. Centex Corp.,* 761 F.2d 33, 41 (1st Cir. 1985), *aff'd,* 813 F.2d 403 (4th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987).

In addition, the rate of return to the holder of a pass-through certificate was defined by the underlying promissory notes, and was wholly independent of any subsequent performance by EMI.

The courts uniformly hold that the purchase and sale of whole loans and loan participations in analogous transactions do not involve securities. *Deauville Savings & Loan Ass'n v. Westwood Savings and Loan Ass'n,* 648 F.Supp. 513, 519 (C.D.Cal. 1986).

EMI's sales were commercial transactions and not "investments", to which federal securities laws would apply.

■ The purchaser of the pass-through certificate, fully collateralized by a pool of the mortgage loans which EMI had originated and Foremost insured, was not engaged in a common venture.

Lower courts have split on the issue of whether the "common venture" requirement of the *Howey/Forman* test contemplates "horizontal" commonality or "vertical" commonality. Some courts have required horizontal commonality, which is a "common venture" among a number of similarly situated investors. *Federal Deposit Insurance Corp. v. W.R. Grace & Co.,* No. 84 C 5031, slip op. (N.D.Ill.1987) [available on WESTLAW, 1987 WL 17495], quoting *Stenger v. R.H. Love Galleries, Inc.,* 741 F.2d 144, 146 (7th Cir.1984); *Kefalas v. Bonnie Brae Farms, Inc.,* 630 F.Supp. 6, 8 (E.D.Ky.1985): *Salcer v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 682 F.2d 459, 460 (3d Cir.1982).

The decision in *Cahill v. Contemporary Perspectives, Inc.* [1986–1987] Fed.Sec.L. Rep. (CCH) ___ 92,720 (S.D.N.Y.1986) [available on WESTLAW, 1986 WL 4696], illustrates the "horizontal" approach. *Shotto v. Laub,* 635 F.Supp. 835 (D.Md.1986), illustrates vertical commonality. In the present case, the fortunes of the various financial institutions which purchased EMI's certificates were not tied to each other or to the fortunes of EMI. Whether the "horizontal" or "vertical" approach is used, there was no "common venture".

The third element of the *Howey/Forman* test requires that the investor make an investment in a common venture "with a reasonable expectation of profit". In this case there was no "expectation of profit" within the meaning of *Howey* and *Forman.*

■ Here, all that the purchasers of the certificates of interest in the pool of mortgage loans were entitled to receive was repayment of the principal amount of the mortgage loans with interest at the rate specified in the mortgage notes. The amounts of interest to be paid did not vary with the success of the venture; they were dictated by the terms of the notes.

Obligations of this sort do not involve "profit" for purposes of determining whether the obligations involved are securities. Payments of interest are "not directly tied to profitability," *McVay v. Western Plains Service Corp.*, 823 F.2d 1395, 1399 (10th Cir.1987), since they are not dependent on, and do not vary with, the success of the venture. *See e.g., American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1254 (7th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir. 1978). The courts have, therefore; consistently refused to recognize the simple payment of interest to a financial institution for the use of its funds as "profits" within the meaning of the *Howey/Forman* test. *See, e.g., First Financial Federal Savings and Loan Association v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685 (8th Cir. 1987).

The final element of the *Howey/Forman* test is the requirement that profits must be earned from the "entrepreneurial or managerial efforts of others". This element requires that the efforts of the seller must be the essential managerial efforts that are critical to the success or failure of the "investment". *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 650 F.Supp. 1378, 1383 (W.D.Va.1986); *Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797, 803 (E.D.N.C.1986), *aff'd*, 833 F.2d 1006 (4th Cir.1987). In this case, EMI performed no entrepreneurial or managerial functions. Its sole obligation to the certificateholders was to service the loans they purchased. *Kansas State Bank in Holton v. Citizen Bank of Windsor*, 737 F.2d 1490 (8th Cir.1984). *Financial Federal Savings and Loan Ass'n. v. Savings Investment Service Corp.*, [Current] Fed. Sec.L.Rep. (CCH) ▬ 93,190 (W.D.OK.1986) [available on WESTLAW, 1986 WL 641].

For all of the reasons stated above, the certificates of participation sold by EMI in pools of mortgage loans originated by EMI and insured by Foremost are not securities and the claims of the purchasers of these certificates against Foremost are not cognizable under the Securities Act.

To establish a primary violation of Rule 10b–5 by Foremost, purchasers of EMI's certificates of participation must establish that Foremost made an untrue statement of a material fact, or omitted a material fact necessary in order to make the statements Foremost made (in light of the circumstances under which they were made) not misleading.

■ No evidence was introduced at trial to establish any representation by Foremost to any of the purchasers of certificates from EMI. Nor can representations be implied by the issuance by Foremost of certificates of insurance. *See Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 545 (2nd Cir.1967).

■ Foremost could have committed a primary violation of Rule 10b–5 only if Foremost had a duty to disclose material facts known to it and did not do so. Because the insurer-insured relationship does not create fiduciary duties on the part of the insurer, no Court has imposed a duty to disclose on any insurer in the context of the securities laws. *See Bolden v. John Hancock Mutual Life Insurance Co.*, 422 F.Supp. 28, 31 (E.D. Michigan 1976); G. Couch, Encyclopedia of Insurance Law, 2nd Section 23: 10 at 784 (1984).

In any event, no evidence was introduced at trial to establish that Foremost failed to disclose, to the financial institutions which purchased the certificates of participation, any material fact about the EPIC program or EMI's application for a certificate of insurance that Foremost knew or could reasonably have discovered which was not already known to the financial institution.

1250

A § 10(b) violation requires scienter. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court identified the scienter element of a § 10(b) cause of action.

Most lower courts have ruled that proof of reckless conduct will satisfy the § 10(b) requirement of scienter, but have carefully circumscribed the sort of conduct that may be considered reckless. In *SEC v. American Realty Trust*, 429 F.Supp. 1148, 1171 (E.D.Va.1977) *rev'd on other grounds*, 586 F.2d 1001 (4th Cir.1978), the court observed that only the "kind of recklessness that is equivalent to willful fraud" would suffice. *American Realty*, at 1171 n. 8, (quoting in part *SEC v. Bausch & Lomb, Inc.*, 420 F.Supp. 1226 (S.D.N.Y.1976). On the facts in *American Realty*, the District Court found that the absence of scienter defeated both the § 10(b) and § 17(a) (of the Securities Act) claims before it. The Court of Appeals reversed because it found § 17(a) did not require scienter and did not consider whether the defendant's conduct was recklessness for purposes of § 10(b).

The Fifth and Eleventh Circuits require "severe recklessness," defined as "highly unreasonable omissions and misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that presents a danger of misleading buyers and sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell International Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (en banc), *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). *White v. Sanders*, 689 F.2d 1366, 1367, n. 4 (11th Cir.1982); *Woods v. Barnett Bank*, 765 F.2d 1004 (11th Cir.1985). Similarly rigorous formulations of recklessness, without the requirement that it be "severe", are common. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sanders v. Joan Nuveen & Co.*, 554 F.2d 790, 792–793 (7th Cir.1977), *cert. denied*, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981);

*Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277 [Current Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 93,360 (W.D.Mich.1986) (highly unreasonable conduct constituting an "extreme departure from the standards of ordinary care").

There was no evidence introduced at trial that Foremost's statements or actions involved an intent to deceive, or were "reckless."

No liability can exist in an action brought under § 10b of the Securities Act unless the challenged misrepresentations or omissions occurred "in connection with" the purchase or sale of a security. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), *reh'g denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). A showing must be made of causation between the alleged fraud and the purchase of the security. *Ketchum v. Green*, 415 F.Supp. 1367 (W.D.Pa.1976), *aff'd*, 557 F.2d 1022 (3rd Cir.1977), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). And, consistent with this concept, conduct occurring after the purchase of a security cannot be the basis of liability. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539, *reh'g denied* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975); *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 943 (3rd Cir.1985), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed. 2d 274 (1985); *Shamrock Associates v. Moraga Corp.*, 557 F.Supp. 198 (D.Del. 1983).

The financial institutions which purchased EMI's certificates dispute the date of sale, focusing on the date the pass-through certificates changed hands, as opposed to the date they committed to purchase them. The case law is absolutely clear, however, that the *commitment date* is the date of sale. *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2nd Cir. 1972).

The execution by the financial institution of commitments to purchase the

certificates of participation before any application for insurance of mortgage loans which collateralized the certificates was made to Foremost acts as an absolute bar to the securities fraud claims asserted by these financial institutions against Foremost.

The existence of a Securities Act violation depends on proof that the misrepresentations or omissions pertain to the securities themselves.

"[M]isrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves do not violate § 10(b) or § 17(a) of the Securities Act of 1933." *Teltronics Services, Inc. v. Anaconda–Ericsson, Inc.*, 587 F.Supp. 724, 731 (E.D.N.Y.1984), *aff'd*, 762 F.2d 185 (2nd Cir.1985).

■ The alleged misrepresentations and omissions at issue in this lawsuit pertain to mortgages which were *subsequently* pooled and sold to counterclaimants via pass-through certificates. No representations are alleged to have been made about these certificates themselves.

The Fourth Circuit has applied *Chemical Bank*'s holding to securities lawsuits. *Head v. Head*, 759 F.2d 1172 (4th Cir.1985). The Court of Appeals construed *Chemical Bank* to answer the question "whether misrepresentations not pertaining to the securities themselves can give rise to an action under … the securities laws" in the negative. *Id.* at 1175. *See also Manufacturers Hanover Trust v. Drysdale Securities Corp.*, 801 F.2d 13 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

■ Before there can be recovery for an alleged misrepresentation, the aggrieved party must establish reliance. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 186 (3rd Cir.1981), *cert denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). That is, the aggrieved party must affirmatively demonstrate that the alleged misrepresentations actually induced each decision, to purchase the pass-through certificates. *Bosio v. Norbay Securities, Inc.*, 599 F.Supp. 1563 (E.D.N.Y.1985); *Raymond v. Miller & Schroeder Municipals, Inc.*,

[1983–1984 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,714, at 97,870 (D.Minn. June 29, 1983) [available on WESTLAW, 1983 WL 1419].

■ The facts adduced at trial established that the financial institutions which purchased certificates of participation made their investment decision without communications with Foremost, directly or indirectly, and were not even aware that Foremost would insure the mortgage loans that collateralized their certificates. These financial institutions have failed to establish the reliance element of a Securities Act cause of action.

■ The classic formulation of an aiding and abetting violation requires that there be: (1) a violation of Rule 10b–5, (2) the defendant's awareness of his role in a web of wrongful activity, and (3) knowing and substantial assistance of the primary violation. *Cleary v. Perfectune, Inc.*, 700 F.2d 774 (1st Cir.1983); *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). *See SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 162–63 (3rd Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ No securities claims have been asserted against the alleged primary violator(s) EPIC and EMI. The existence of such a violation is a prerequisite to aiding and abetting liability. *Iroquois Industries, Inc. v. Syracuse China Corp.*, 417 F.2d 963, 970 (2d Cir.1969).

■ An aider and abettor must "knowingly" participate in the fraudulent scheme. There must be a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff … [T]he assistance provided by the alleged aider and abettor [must be] a substantial factor in bringing about the violation. *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1084 (N.D. Cal.1979).

The financial institutions which purchased certificates of participation in pools of mortgage loans originated by EMI and insured by Foremost have not established any of the elements of an aiding and abetting claim.

■ FNB's common law claims against Foremost of fraud, constructive fraud, and negligent misrepresentation are also without merit. Foremost cannot be found to have made fraudulent or negligent misrepresentations to any of the purchasers of certificates from EMI, because it made *no* representations of any kind regarding the insured loans.

Foremost makes claims against the defendants under the federal RICO statute, 18 U.S.C. § 1964(c), which provides a private cause of action to any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. Here, Foremost has alleged that Community and EMI violated section 1962(c).

■ The elements of a section 1962(c) violation are: (i) that there was an enterprise, (ii) that the enterprise affected interstate commerce, (iii) that the defendant was employed by or associated with the enterprise, (iv) that the defendant engaged in a pattern of racketeering, and (v) that the defendant conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.

■ Section 1962(c) requires proof of a RICO "person"—here, Community—and a RICO "enterprise"—here, the EPIC partnerships either individually or as an association in fact. However, in this and most other circuits, the RICO person must be sufficiently distinct from the RICO enterprise or a RICO claim cannot be sustained.

In *United States v. Computer Sciences*, 689 F.2d 1181 (4th Cir.1982), the Fourth Circuit concluded "that 'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit ..." *Id.* at 1190. The court, therefore, held that a corporation could not be the "person" and a division of the same corporation be the "enterprise." In more

recent cases, the Fourth Circuit has expanded the scope of this decision beyond situations involving a strict legal identity between the person and the enterprise.

In *NCNB National Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir. 1987), the court held "that a 'person' is not distinct from an 'enterprise' when a corporation and its wholly owned subsidiary are involved," despite the fact that both are otherwise separate legal entities. And in *Entre Computer Centers, Inc. v. FMG of Kansas City, Inc.*, 819 F.2d 1279, 1287 (4th Cir.1987), the court also found that two legally separate entities were nevertheless too closely related to support a RICO suit even if they were not within the same corporate family. There, the court applied *Computer Sciences* to require dismissal of a RICO claim in which a franchiser was the alleged "person" and its separately incorporated franchisees were the "enterprise."

■ Epicenter Consolidated, Ltd. ("EPICENTER") was the ultimate parent of EPIC, Community Savings & Loan and EMI. EPIC and EMI were direct subsidiaries of a company called Community Financial Services, Inc. ("CFSI"), which was a wholly-owned subsidiary of Community. EPIC was in turn the sole general and managing partner of each limited partnership. This connection between Community and the limited partnerships, therefore, negates the distinction between the "person" and "enterprise" necessary to support a RICO claim. Because the limited partnership could act only through their general partner, they were, in practical effect, analogous to subsidiaries of Community. Certainly, the relationship between Community and the EPIC partnerships was no more distant than that between a parent and subsidiary, or a franchiser and its franchisees.

■ Section 1962(c) also requires a "pattern of racketeering activity." A pattern of racketeering activity means, at the barest minimum, the commission of two predicate acts, but two acts are not necessarily sufficient. As the Supreme Court observed in *Sedima, S.P.R.L. v. Imrex Co.*,

473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), "in common parlance two of anything do not generally form a 'pattern.'" Rather, to constitute a *pattern* of racketeering activity, there must be continuity plus relationship.

The United States Court of Appeals for the Fourth Circuit has held that multiple related acts of racketeering are not likely to constitute a pattern if they are in furtherance of a single, limited fraudulent scheme:

> If the commission of two or more "acts" to perpetrate a single fraud were held to satisfy the RICO statute, then every fraud would constitute "a pattern of racketeering activity." It will be the unusual fraud that does not enlist the mails and wires in its service at least twice. Such an interpretation would thus eliminate the pattern requirement altogether.

*International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154 (4th Cir.1987). If the predicate acts are in furtherance of a single scheme, the plaintiffs must show that these are "the kind of ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Eastern Publishing and Advertising, Inc. v. Chesapeake Publishing and Advertising, Inc.,* 831 F.2d 488, 492 (4th Cir.1987) (quoting *Zepkin,* 812 F.2d at 154).

This case does not involve a pattern of racketeering. At most, Foremost has established a single limited scheme to obtain PMI insurance from it for the EPIC product loans. Numerous subsidiary contacts between EMI and Foremost may have been necessarily involved, but that reflects only the nature of the product involved and should not be used as a measure of any pattern of activity. *HMK Corp. v. Walsey,* 828 F.2d 1071, 1073–74 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 706, 98 L.Ed.2d 657 (1988).

An essential element of the private right of action for civil RICO is an injury to the plaintiff's business or property as a direct result of the commission of the predicate acts. *See Sedima,* 473 U.S. at 497, 105 S.Ct. at 3285. Foremost has made no showing of damages. It present-ed no evidence of injury to its business or property since it has prevailed on its rescission claims. There is no uncompensated injury to support the civil RICO claim and its civil RICO suit must fail.

Defendants have asserted claims against the PMI's for breach of contract. The plaintiffs and counterdefendants did not breach the contracts of insurance at issue in this case, but rather were entitled to rescind those contracts by virtue of the misrepresentation and fraud perpetrated in their procurement.

Defendants have filed cross-claims against EMI for compensatory and punitive damages. The parties have deferred addressing the contingent cross-claims pending this court's decision on the principal claims. The parties are granted leave to move to supplement or amend the court's findings and rulings on the issues contained in the cross-claims.

An appropriate order shall issue.

## ORDER

In accordance with the accompanying Findings of Fact and Conclusions of Law it is hereby ORDERED:

(1) That judgment is entered in favor of the plaintiffs on the fraud and misrepresentation claims, and the mortgage insurance policies that are the subject of this action are rescinded.

(2) That judgment is entered for the defendants on the RICO claims.

(3) That judgment is entered for the plaintiffs and counterdefendants on the counterclaims.